GEORGE KLIMKO AND THERESA KLIMKO,
PLAINTIFFS–APPELLANTS, v. ANGELO C.
ROSE, DEFENDANT–RESPONDENT.

Argued September 25, 1979—Decided November 20, 1980.

*Joseph A. Spinella* argued the cause for appellants (*Eugene D. Molinaro*, attorney).

*Anthony C. Stuart* argued the cause for respondent (*Pantages, Sellar, Richardson & Stuart*, attorneys).

The opinion of the Court was delivered by

WILENTZ, C. J.

Plaintiffs, George and Theresa Klimko, brought this action against Dr. Rose, a chiropractor, for injuries to Mr. Klimko including a stroke and temporary paralysis, which allegedly resulted from chiropractic adjustments performed upon him by defendant. Plaintiff's only expert witness was a medical doctor. For reasons discussed below he was unavailable for cross–examination, and his direct testimony was therefore

stricken. Believing that he had no case without the stricken testimony, Klimko moved for a mistrial. The trial court denied the motion, and after some additional direct testimony, granted defendant's motion for involuntary dismissal. The Appellate Division's affirmance of that dismissal is now before us for review.

In September 1973, George Klimko sought treatment from defendant for back and neck pains that developed after he had spent Labor Day weekend working around his back yard.[1] Both he and his wife had seen Dr. Rose for back pains on prior occasions. Dr. Rose, as he had before, manipulated Klimko's spine while Klimko lay face down on a table. On a second visit, in addition to the manipulation familiar to Klimko, Dr. Rose performed a different treatment. He instructed Klimko to lie on his left side. Dr. Rose then placed one hand under the left side of plaintiff's neck and with the other hand thrust down on the right side of plaintiff's neck. After this treatment Dr. Rose told the plaintiff to sit up, which he did. He felt dizzy and sweaty, and so told the doctor, who told him to "... sit there a while because some people are affected this way, it will wear off." Dr. Rose then told him to go out to the waiting room. Plaintiff remained several minutes; although he still felt dizzy, he decided to go home.

When he arrived home his wife noticed that his skin was "sort of a gray color and his eyes didn't look very clear." Klimko was still dizzy, had no appetite, refused lunch and went to sleep immediately. When he awoke he still did not feel quite right. Mrs. Klimko, concerned about the continued dizziness, called Dr. Rose and advised him of her husband's condition. Dr. Rose told her that plaintiff should come back to see him that night. During that evening visit, on September 13, Dr. Rose performed

---

[1] In light of the trial court's grant of involuntary dismissal, for purposes of appellate review we draw those reasonable inferences most favorable to plaintiff's cause of action, and accept plaintiff's allegations and the testimony adduced on plaintiff's behalf as true. *See, e. g., Portee v. Jaffe,* 84 *N.J.* 88, 90–91 (1980); *Berman v. Allen,* 80 *N.J.* 421, 426 (1979); *Heavner v. Uniroyal, Inc.,* 63 *N.J.* 130, 133 (1973).

the regular back adjustment. At this point the dizziness had disappeared, but Klimko was still suffering the pain and tightness in his back.

The symptoms of tightness and pain in his back persisted, and Klimko visited Dr. Rose again. Dr. Rose performed the regular adjustment, moving the vertebrae with his hands starting in Klimko's lower back and continuing up to the shoulder blades. Klimko suffered no dizziness or sweatiness during this treatment or when he sat up after it.

During the next and last visit, the regular adjustment was performed. In addition, Dr. Rose again thrust against the right side of Klimko's neck precisely as he had on the second visit. When plaintiff sat up, he felt not only dizzy and sweaty but nauseated as well. After sitting in the waiting room for a few minutes, he collapsed. Dr. Rose loosened Klimko's clothing, ordered his nurse to take Klimko's blood pressure, and summoned an ambulance. He concluded that Klimko had suffered a stroke.

Klimko was hospitalized for 16 days. He was paralyzed on his left side and unable to speak. He lost the use of his left arm completely for a period of time and was out of work for 27 weeks. Although the severe symptoms had receded, plaintiff continued to suffer some permanent residual effects.

At trial Klimko's expert witness, Dr. Gruber, a physician, testified that the cause of the stroke was the pressure applied by Dr. Rose to Klimko's neck. He explained that the brain is supplied with oxygen by two arteries, one on each side of the neck running up to the brain, and that these arteries are often of different sizes. In Klimko's case, the one on the right side was much larger than normal, the one on the left much smaller. Thus when Dr. Rose applied the pressure or thrust to the right side of the neck the flow of blood to the brain from this larger artery was completely stopped. Since the artery on the left side was so much smaller, the blood supply from it was insufficient to provide adequate oxygen to the brain, resulting in a stroke. When asked whether the treatment rendered by Dr. Rose con-

formed to applicable standards, Dr. Gruber was not permitted to answer because he had stated that he had no knowledge of standards of treatment applicable to chiropractors.

Dr. Gruber appeared the next day for cross–examination but plaintiff's counsel allowed him to leave to perform an emergency operation, since the trial judge was temporarily engaged in other matters. Dr. Gruber never appeared again. When his failure to reappear prevented the trial from proceeding, the trial judge stated that whether plaintiff subpoenaed him or not, the trial judge himself was going to ensure the doctor's presence by issuing a warrant for his arrest if necessary.[2]

The record shows that the difficulty with Dr. Gruber's reappearance related to his demand for additional fees. Mr. and Mrs. Klimko immediately attempted to resolve the problem without success. Plaintiffs' counsel also tried to get in touch with the doctor. A certified check for the amount he required was prepared but for reasons not revealed in the record it could not be delivered to him. In sum, plaintiffs made a good faith attempt to have the doctor appear on the next trial day. The court, however, appeared to believe, mistakenly, that it had ordered plaintiffs to serve the doctor with a subpoena, and that plaintiffs were somehow at fault for not having issued one. The court refused to continue the matter. On motion of defendant, who had not had the opportunity to cross–examine Dr. Gruber, the court struck his testimony.

---

[2]The trial judge stated:

"Well, the only thing I can do in view of the situation, if you serve him with a subpoena, I will fix his fee. If he doesn't show up on Monday morning at nine o'clock I will have him arrested. You may pass the word to him. Serve him with a subpoena whether you do or don't, I'm going to order him back here at nine o'clock on Monday morning and if he fails to appear I will send a sheriff's officer to put him in custody and he's liable to find himself in the Bergen County Jail. I have a duty to the taxpayers as well as Dr. Gruber and I'm not interested in his fee. I will fix his fee and what he'll get it won't be any thousand dollars in advance and you can pass the word to him and we're waiting almost a whole day and will have wasted a day because of his failure to cooperate. He has testified on direct and Mr. Stuart is entitled to cross–examine."

Having no other expert witness, plaintiffs' counsel moved for a mistrial. Dr. Gruber's testimony provided the only causal connection between Dr. Rose's treatment and Klimko's injury. Once the court struck that testimony, all that remained under the proofs was the occurrence of the manipulations and a subsequent injury. There was nothing before the jury that would provide either the causal connection between the two or any deviation from any applicable standard of care.

The trial judge denied the mistrial motion. He concluded that by virtue of the failure to subpoena Dr. Gruber, counsel had caused the problem; moreover, to grant a mistrial would be a waste of time since Dr. Gruber, having no knowledge of standards applicable to chiropractors, could not at this or any other trial establish Dr. Rose's negligence. Plaintiffs' counsel then called Dr. Rose himself to the stand, to no avail. That completed his case. The court thereafter granted defendant's motion for involuntary dismissal.

The Appellate Division affirmed, in an unreported decision, holding that the trial judge's refusal to grant a mistrial was not an abuse of discretion. Judge Horn dissented on the ground that the dereliction of plaintiffs' counsel, if any, was insufficient to warrant the total denial of relief that necessarily resulted from the refusal to grant a mistrial. He concluded that the trial court's mistaken exercise of its discretion warranted a new trial. He also raised the question, but found it unnecessary to determine, whether Dr. Gruber's testimony along with plaintiffs' might not have been sufficient to require submission of the case to the jury. He concluded that since Dr. Gruber's testimony had been stricken the question of its sufficiency was "out of the case." He did note, however, several exceptions to the rule requiring expert testimony to establish malpractice and suggested that one or more might be applicable to the present facts. The Klimkos appealed as a matter of right. *R.* 2:2–1(a)(2).

Were it clear that Dr. Gruber's *completed* testimony would have allowed submission of the case to the jury, the need for reversal would be plain. Failure to produce this witness, however, was not plaintiffs' fault; at most it was excusable neglect.

Under the circumstances present here, where a party's claim was completely dependent upon a particular witness's testimony, inability to produce that witness—as distinguished from neglect or willful failure—and the almost certain irretrievable loss of the claim warranted a mistrial, and refusal to grant one was a mistaken exercise of discretion. *Cf. Nadel v. Bergamo*, 160 *N.J.Super.* 213 (App.Div.1978) (error to grant summary judgment when plaintiff's medical expert died; trial court should have allowed time to find new expert); *Carbone v. Warburton*, 22 *N.J.Super.* 5, 14–15 (App.Div.1952), *aff'd* 11 *N.J.* 418 (1953) (trial judge should exercise discretion liberally in accepting qualifications of plaintiff's medical expert in order to afford plaintiff opportunity for remedy); *Pepe v. Urban*, 11 *N.J.Super.* 385, 389 (App.Div.), certif. den., 7 *N.J.* 80 (1951) (trial judge's failure to adjourn or grant dismissal without prejudice when plaintiff's medical expert for damages did not appear infringed plaintiff's substantial rights; new trial granted). *See generally Greenberg v. Stanley*, 30 *N.J.* 485, 503 (1959); *Wright v. Bernstein*, 23 *N.J.* 284, 296 (1957); *Schuttler v. Reinhardt*, 17 *N.J.Super.* 480, 484–86 (App.Div.1952).

The situation here, however, is somewhat different. Both the trial court and the Appellate Division majority concluded that even had the stricken testimony been completed and remained in the case, plaintiff would nevertheless have failed to prove a case warranting submission to the jury. This is because Dr. Gruber, having no knowledge of the standard of care applicable to chiropractors, was incompetent to prove that essential element. Defendant contends that no other evidence filled the void, and the Appellate Division majority agreed.

█ If indeed no case warranting submission to the jury could have been developed even *with* Dr. Gruber's testimony, the trial court's refusal to grant a mistrial would constitute harmless error.[3] We must therefore determine whether, on the existing

---

[3]The dissenting judge apparently believed that the record rendered it impossible to determine what Dr. Gruber's testimony might have disclosed, and that once an expert's testimony is stricken, no inquiry could ever be made as to

record including Dr. Gruber's testimony, a *prima facie* case was established. Direct examination had been completed. Plaintiff makes no claim that, had Dr. Gruber reappeared, further testimony favorable to plaintiff would have been adduced. While it is possible, of course, that cross–examination might inadvertently have supplied some element missing from the case, we do not believe that plaintiff can claim harmful error by asserting that his adversary was deprived of the opportunity of making a mistake. All that Dr. Gruber proved was that defendant's manipulations caused the stroke. He did not prove malpractice. While ordinarily such lack of proof is the clearest type of insufficiency in a malpractice case, the absence of testimony explicitly outlining the applicable standard of care and the deviation therefrom is not invariably fatal to a cause of action sounding in negligence. *See generally W. Prosser, The Law of Torts*, §§ 32, 40 (4th ed. 1971); *F. Harper & F. James, The Law of Torts*, §§ 17.1 & n. 15, 19.6 & n. 12 (1956 & supp. 1968); Pearson, "The Role of Custom in Medical Malpractice Cases," 51 *Ind.L.J.* 528 (1976); Note, "Malpractice & the Healing Arts–Naturopathy, Osteopathy, Chiropractic," 9 *Utah L.Rev.* 705, 718–22 (1965). In the absence of such direct testimony, the issue is whether there was other testimony from which the jury could determine the applicable standard and its violation.

Initially, we observe that where the evidence suggests to people of ordinary intelligence what the standard of care is, or what the deviation from that standard is, or both, juries have been allowed to determine that standard or deviation regardless of the absence of expert testimony. The facts of a given case may be such that the common knowledge and experience possessed by laymen may enable a jury to conclude, without expert

---

whether that testimony, combined with all other testimony, would have warranted submission of the case to the jury and therefore would justify the grant of a mistrial. Such a determination can, and should, be made. Obviously it is important to be confident, in such a determination, that the full thrust of the testimony that was not completed is known and appreciated. If there is doubt on that score, the automatic reversal implied by the dissent might be more appropriate.

testimony, in a malpractice action as in any other negligence action that a duty of due care has been breached. *See Sanzari v. Rosenfeld*, 34 *N.J.* 128, 141–43 (1961) (dentist should not use anesthetic drug on patient known to him to be susceptible to harmful side effects when such use is contraindicated by brochure accompanying drug); *Tramutola v. Bortone*, 118 *N.J.Super.* 503, 512–13 (App.Div.1972), modif. on other grounds, 63 *N.J.* 9 (1973) (physician should be able to identify needle visible in X–ray of patient's lung and should inform patient of presence of needle); *Jones v. Stess*, 111 *N.J.Super.* 283, 287 (App.Div.1970) (chiropodist should not perform cutting procedure when upset by outside distractions, especially when he knows that patient is diabetic and knows of special risks to diabetics from cuts); *Becker v. Eisenstodt*, 60 *N.J.Super.* 240, 246 (App.Div.1960) (surgeon should not use caustic rather than soothing solution to clean patient's nose); *Steinke v. Bell*, 32 *N.J.Super.* 67, 70 (App.Div.1954) (dentist should not pull wrong tooth).

The characterization of the knowledge as "common" is somewhat misleading, for some of it, in varying degrees, is technical. What is meant, however, is that whether technical or not, it is knowledge possessed by untrained laymen of ordinary experience and intelligence. While the law does not conclusively accept the layman's interpretation of all he or she has read, heard or seen, it usually allows a jury to use information and knowledge so acquired, whether correctly understood or not, for decision–making inferences. The remedy for inaccuracy is then the right of those who dispute the common knowledge to produce proof to the contrary. In this respect, these facts of common knowledge differ from those of which judicial notice is taken: the former may be rebutted, but not the latter. *Evid.R.* 11.

In this case it would not be unusual for a layman to know that arteries run through the neck to the brain and that if the blood supply to the brain is cut off by pressure on those arteries, substantial physical damage is likely. Whether the symptoms exhibited by Klimko indicated, as a matter of common knowl-

edge, that there was a risk that such damage was likely to occur is a somewhat more difficult question.

Common knowledge that dizziness and sweatiness suggest potential danger might be said to be counterbalanced by Dr. Rose's testimony that those symptoms often appear when one rises from a prone position, and do not suggest any risk at all. This explanation, however, fails to account for the fact that Klimko had never become dizzy before. Further, it is inferable that Dr. Rose knew that Klimko remained dizzy for quite a period after the treatment, that his color was gray, that he had no appetite, that he went to sleep immediately thereafter and that he still did not feel well later in the day. From all of this, common knowledge could allow a jury to find that a reasonably prudent chiropractor should have known that there was a risk involved in repeating the further neck adjustment, and that he should not have repeated the treatment without a much more intensive inquiry than he had made.

We conclude therefore that had Dr. Gruber's testimony not been stricken, the entire case would have justified a jury in finding that Dr. Rose should have realized that the neck adjustment created a risk of serious damage to the plaintiff; that he owed plaintiff a duty not to repeat such adjustment without consulting with a physician or in some other way further advising himself about the risk; and that repeating the procedure without precautionary measures constituted a breach of duty. Since Dr. Gruber's testimony would have permitted the case to go to the jury, refusal to grant a mistrial was prejudicial error and requires reversal and a new trial. If, upon retrial, the evidence is as we have assumed it would have been in the original trial, nothing stated herein forecloses defendant from presenting testimony to the effect that the standard of care and treatment of the chiropractic profession would not have required the recognition of any risk to Klimko from the neck adjustment in these circumstances or, such risk recognized, would not have required any cautionary or investigative procedures to have been undertaken to prevent damage from repetition of the

treatment.[4]  Defendant may also present evidence bearing on the "common knowledge" assumptions, e. g., to show that pressure does not affect the brain, that dizziness is not a symptom of possible injury, and the like.[5]

----

[4]We note, however, that when a risk is obvious and a precautionary measure available, an industry or professional standard or custom that does not call for such precaution is not conclusive if, regardless of the standard or custom, the exercise of reasonable care would call for a higher standard, i. e., for precautionary measures. See, e. g., Wellenheider v. Rader, 49 N.J. 1 (1967); Adams v. Atlantic City Elec. Co., 120 N.J.L. 357 (E. & A. 1938); Shafer v. H. B. Thomas Co., 53 N.J.Super. 19 (App.Div.1958).

[5]In view of the possibility that plaintiffs may present other witnesses and different testimony upon retrial, we note the possible availability of other so-called exceptions to the asserted rule that the applicable standard of care in a malpractice action must be established by a member of defendant's profession. Sanzari v. Rosenfeld, supra, recognized this rule, 34 N.J. at 136. Sanzari, however, held both that an experienced medical doctor was competent to testify to the standard of care applicable to a dentist administering anesthesia and that on the facts of that case common knowledge would have sufficed to send the case to the jury. Id. at 143.  We doubt, therefore, whether Sanzari can be said to require the testimony of a chiropractor to establish the applicable standard of care in this case.  In any event, since the reason for the requirement is to assure "the minimal technical training and knowledge essential to the expression of a meaningful and reliable opinion," id. at 137, we perceive no problem as to the competence of a medical doctor who has, through study or experience, familiarized himself with the standard of care applicable to chiropractic.  The criterion would not appear to be concordance of belief, but rather sufficient, demonstrable knowledge of the standards of defendant's profession.  We express no opinion whether less might suffice, or under what circumstances. See, e. g., Ison v. McFall, 55 Tenn.App. 326, 400 S.W.2d 243, 257 (Ct.App.1964) (physician competent to testify in action against chiropractor; any healer, including chiropractor, should have realized danger in continuing spinal manipulations after patient began to lose control of his legs).

Moreover, we note that the court in Lewis v. Read, 80 N.J.Super. 148 (App.Div.), certif. den., 41 N.J. 121 (1963), found a medical doctor who specialized in the nervous system competent to testify in an action against an obstetrician. 80 N.J.Super. at 168. See also Sanzari, supra, 34 N.J. at 137. This exception to the general rule of competence has been termed the "overlap" exception. See Annot., "Malpractice–Witness–Competency," 85 A.L.R.2d 1022.  The term overlap, however, is not so much an exception to an operative rule as it is a shorthand description of the general requirement that an expert witness be qualified to testify through knowledge or experience.

For the reasons set forth above, the judgment of the Appellate Division is reversed and the matter remanded for a new trial in light of this opinion.

*For reversal and remandment* –Chief Justice WILENTZ and Justices SULLIVAN, PASHMAN, SCHREIBER, HANDLER and POLLOCK–6.

*For affirmance* –None.

---

The doctrine of *res ipsa loquitur*, when applicable, has also served to obviate the need for expert testimony in malpractice cases. *See Martin v. Perth Amboy Gen. Hosp.*, 104 *N.J.Super.* 335 (App.Div.1969); *Renrick v. Newark*, 74 *N.J.Super.* 200 (App.Div.), certif. den., 38 *N.J.* 309 (1962); *Gould v. Winokur*, 98 *N.J.Super.* 554 (Law Div.1968), *aff'd*, 104 *N.J.Super.* 329 (App.Div.), certif. den., 53 *N.J.* 582 (1969).

As to the so-called general rule of competency, in any event, *quaere* whether so many exceptions would have developed were the rule sound in the first place. *See generally* Annot., *supra*.