215 N.J. Super. 349 (1987)
521 A.2d 1323
EUGENE JENOFF AND LEONARD JENOFF, EXECUTORS OF THE ESTATE OF BETTY M. JENOFF, DECEASED, PLAINTIFFS-APPELLANTS,
v.
JAMES F. GLEASON, M.D., MARK R. PECK, M.D. DANIEL R. DEMEO, M.D., AND ATLANTIC SHORE ORTHOPEDIC ASSOC., DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Submitted December 9, 1986.
Decided March 2, 1987.
*352 Before Judges O'BRIEN, SKILLMAN and LANDAU.
Benedict A. Casey, attorney for appellants.
Stanley P. Stahl, attorney for respondent James F. Gleason, M.D.
George & Korin, attorneys for respondent Mark R. Peck, M.D. (Joel B. Korin, on the brief).
Orlovsky, Wilson & Gabrysiak, attorneys for respondent Daniel R. DeMeo, M.D. (John R. Orlovsky, of counsel; James J. Wilson, on the brief).
The opinion of the court was delivered by O'BRIEN, J.A.D.
Plaintiffs appeal from the dismissal of their action against defendant Dr. Mark R. Peck (Peck) at the end of their case, pursuant to R. 4:37-2(b), and the denial of their motion for a new trial against defendants Dr. James F. Gleason (Gleason) and Dr. Daniel R. DeMeo (DeMeo). We reverse as to Peck and DeMeo, but affirm as to Gleason.
Betty Jenoff (Jenoff) fractured her wrist at work on September 2, 1980. She was hospitalized on September 13, 1980 for a surgical procedure on her wrist. X-rays were ordered of plaintiff's left wrist and chest. Chest X-rays were ordered because of a hospital policy established by the department of anesthesiology, to obtain chest X-rays of all adult patients to determine whether the patient would be a suitable candidate for anesthesia. *353 Chest X-rays were taken on September 14 and 15, 1980.[1] Both chest X-rays were read by Peck, a radiologist, on the day they were taken, at which time he dictated a report of his findings. Both reports reflect a finding of a two centimeter nodule within the left lower lobe, suggesting possible bronchogenic neoplasm (a lung tumor). The first report recommended tomography of the area for further delineation, and the second report recommended appropriate follow-up examinations. Peck did not communicate his findings to her treating physician other than by the preparation of his reports. The reports were actually typed on September 16, 1980 and arrived at the nurses' station on the floor where Jenoff was hospitalized on September 17, 1980, after she had been discharged.[2]
Jenoff underwent general anesthesia and the wrist surgery was successfully performed on September 15, 1980. Because of pain, her scheduled discharge for September 16 was delayed until September 17, 1980.
Jenoff had been under the care of Gleason, a specialist in cardiovascular disease and internal medicine, for many years. Jenoff had been hospitalized in February 1980 for a heart problem and had only returned to work on April 9, 1980.[3] Because of Jenoff's other conditions, particularly her vascular problems, Gleason was consulted by the orthopedic group for a medical evaluation prior to her wrist surgery. This consultation *354 occurred on September 14, 1980 at 11:00 a.m., before the chest X-ray had been taken. Gleason concluded that Jenoff was an "acceptable risk for surgery tomorrow subject to chest X-ray." The following morning, September 15, Gleason attempted to look at the X-rays, but was advised that they were in the operating room with the patient. Since the chest X-ray had been taken for purposes of administering anesthesia and the patient was in the operating room, Gleason did not thereafter review the X-ray nor the interpretative report.
DeMeo, an orthopedic surgeon, performed the surgery on Jenoff's wrist. Although he viewed the wrist X-rays in the operating room, he did not see the chest X-rays. Jenoff was discharged from the hospital on September 17, and had follow-up visits to DeMeo at his office. A discharge summary was prepared on October 27, 1980 by a licensed practical nurse on behalf of DeMeo who subsequently reviewed and signed it. According to DeMeo, when the discharge summary was prepared and he reviewed it, the interpretative report of the chest X-rays was not attached to Jenoff's hospital records. Nonetheless, as part of the discharge summary, the licensed practical nurse put down "chest X-ray unremarkable" and DeMeo checked and approved it. DeMeo acknowledged his responsibility for the discharge summary.
On November 26, 1980, Jenoff's hospital records were reviewed by a nurse on behalf of Travelers Insurance Company, the workers' compensation carrier for Jenoff's employer. She became alarmed by the chest X-ray finding and wrote to DeMeo and Gleason. Gleason then ordered new chest X-rays to be taken which revealed growth of the tumor. Jenoff was finally informed of her condition on December 10, 1980. A mediastinoscopy performed in January revealed that the disease had spread. Radium and chemical therapy followed, but Jenoff died on September 25, 1982.
During her lifetime Jenoff had instituted two separate medical malpractice actions against various parties. After Jenoff's *355 death, her sons, as executors of her estate, were substituted as plaintiffs. The consolidated cases were tried against Peck, Gleason and DeMeo on January 30, 1985.[4] At the end of plaintiffs' case, the trial judge dismissed it with prejudice as to Peck, pursuant to R. 4:37-2(b). Since there were no cross-claims between defendants the provisions of R. 4:37-2(c) were not applicable.[5]
The case was submitted to the jury against DeMeo and Gleason with special interrogatories. The jury returned a five-to-one verdict, finding that neither DeMeo nor Gleason was negligent. Because of that finding, interrogatories concerning proximate causation, damages and comparative negligence were not answered. Plaintiffs' motions for a new trial and to vacate the dismissal as to Peck were denied by the trial judge. This appeal followed.

DR. PECK
The trial judge dismissed the complaint as to Peck because he concluded there had been no testimony which indicated a breach of duty or of any accepted medical standards. He concluded that the proper method of communicating a radiologist's findings as to the chest X-rays was a matter requiring expert testimony.
During the presentation of plaintiffs' case, Gleason testified that it had been his experience that where there was an unusual or unexpected finding in an X-ray, "it would be fairly standard procedure" for the radiologist to call him and they would review the film. Gleason conceded, however, that he could not testify as to the procedure or protocol in the department of *356 radiology. In his testimony, Gleason quoted from his deposition, where he had said:
That in a situation such as this where you have a chest X-ray that is abnormal and the patient is, by admission data, a surgical patient, in this case on the orthopedic surgical service, and an unexpected finding such as a lung tumor comes up, many times the radiologist will have notified the surgeon who in turn has called the medical man.
On many occasions in the past this type of unusual finding, the radiologist has immediately or as soon as possible notified the surgeon.
The court concluded that since plaintiffs had not named Gleason as an expert against Peck, they had failed to establish by expert testimony a breach of a medical duty or standard by Peck in the presentation of their case.[6]
We disagree. It was conceded that a radiologist has the duty to read and interpret X-rays and report his findings. At issue was the appropriate method for communicating those findings to others. Both Peck and his associate, Dr. Saltzman, who were called during the plaintiffs' case, made a distinction between patients who were in the hospital and those who were not. As to hospitalized patients, the report of the findings of the radiologist is sent to the floor where the patient is staying, to be affixed to the patient's hospital chart. Unfortunately, in *357 Mrs. Jenoff's case, although the radiologist dictated his findings on September 14 as to the first chest X-ray, and September 15 as to the second chest X-ray, these reports were not transcribed until September 16, and did not arrive on the floor until September 17, after Jenoff had been discharged. Thereafter, if DeMeo's testimony is to be believed, the reports were not attached to Jenoff's hospital record until some time after he prepared his discharge summary on October 27. The reports were attached to the records when they were examined by the nurse at Travelers Insurance Company in November.
We conclude that communication of an unusual finding in an X-ray, so that it may be beneficially utilized, is as important as the finding itself. The fact that a physician may only be an indirect provider of medical care is but one relevant circumstance. In some situations, indirect service may provide justification for the absence of direct communication with the patient, but that does not in any way justify failure of communication with the primary care physician. See Phillips v. Good Samaritan Hospital, 65 Ohio App.2d 112, 416 N.E.2d 646, 649 (Ohio Ct. App. 1979); see also Merriman v. Toothaker, 9 Wash. App. 810, 515 P.2d 509 (Wash. Ct. App. 1973). The exigencies of the medical situation may call for different levels of response. In certain situations direct contact with the treating physician is necessary beyond communication through administrative personnel. Phillips, 416 N.E.2d at p. 649. Modes of communication are not so peculiarly within the expertise and knowledge of the medical profession as to necessitate expert testimony. The manner of communication is not so complex and technical that it should escape the comprehension of a lay jury. See id. at 650. The trier of fact should be permitted to pass on the issue of the adequacy of the radiologist's communication. Ibid.
The absence of testimony explicitly outlining the applicable standard of care and the deviation therefrom is not *358 invariably fatal to a cause of action sounding in negligence. In the absence of such direct testimony, the issue is whether there was other testimony from which the jury could determine the applicable standard and its violation. Klimko v. Rose, 84 N.J. 496, 503 (1980). Where the evidence suggests to people of ordinary intelligence what the standard of care is, or what the deviation from the standard is, or both, juries have been allowed to determine that standard or deviation regardless of the absence of expert testimony. Ibid. The facts of a given case may be such that the common knowledge and experience possessed by laymen may enable a jury to conclude, without expert testimony, in a malpractice action as in any other negligence action, that a duty of care has been breached. Id. at 503-504 and the cases cited therein. As the Chief Justice said:
The characterization of the knowledge as `common' is somewhat misleading, for some of it, in varying degrees, is technical. What is meant, however, is that whether technical or not, it is knowledge possessed by untrained laymen of ordinary experience and intelligence. While the law does not conclusively accept the layman's interpretation of all he or she has read, heard or seen, it usually allows a jury to use information and knowledge so acquired, whether correctly understood or not, for decision-making inferences. The remedy for inaccuracy is then the right of those who dispute the common knowledge to produce proof to the contrary. In this respect, these facts of common knowledge differ from those of which judicial notice is taken: the former may be rebutted, but not the latter. Evid. R. 11. [84 N.J. at 504]
We conclude that the method of communicating a radiologist's findings concerning a patient in the hospital is not a matter peculiarly within the knowledge of trained medical experts. Radiology groups and hospital staffs may have different procedures for the communication of such information. However, as part of plaintiffs' case, Dr. Gleason, a doctor with 30 years experience, testified that an unusual finding by the radiologist would be communicated to the treating physician and, in this case, where the admission was for surgery, to the surgeon. Admittedly, this information was not so communicated. Therefore, notwithstanding that there were no cross-claims to preclude dismissal as to Peck at the end of plaintiffs' case, *359 there was sufficient evidence to present a jury question as to the appropriate method of communicating the radiologist's findings to the treating physician. Dismissal of plaintiffs' complaint against Peck was error.

DR. GLEASON AND DR. DE MEO
By their verdict, the jury concluded that neither Gleason nor DeMeo was negligent.[7] The trial judge is required to grant a motion for a new trial if, having given due regard to the opportunity of the jury to pass upon the credibility of the witnesses, it clearly and convincingly appears that there was a miscarriage of justice under the law. R. 4:49-1(a). The trial court's ruling on a motion for a new trial shall not be reversed unless it clearly appears that there was a miscarriage of justice under the law. R. 2:10-1; see Dolson v. Anastasia, 55 N.J. 2, 6-8 (1969).
Our review of the evidence concerning Gleason leads us to conclude that the jury's finding that he was not negligent should not be disturbed. All of Gleason's actions, as well as those of the other physicians involved, except the anesthesiologist, were before the jury for their consideration, and we find nothing in their decision as to Gleason which is against the weight of that evidence. The judgment in favor of Gleason is affirmed.
With respect to DeMeo, however, we conclude that the jury's verdict was against the weight of the evidence and resulted in a miscarriage of justice under the law. The method selected by Peck for communicating his findings on the chest X-rays, including the unusual finding, was by affixing his *360 report, after it was typed, to the patient's record. Through the unfortunate circumstances described above, those findings did not reach the patient's records before she was discharged. DeMeo did not examine and approve the discharge summary prepared by his associate until October 27, 1980, at which time, according to his testimony, the report as to the findings on the chest X-ray were not attached to the record. The discharge summary nevertheless reported the findings of the chest X-ray as "unremarkable." DeMeo concedes that, on the contrary, the chest X-ray findings were "very remarkable." He stated he was upset upon learning of the finding through the insurance company's nurse in November, and strongly expressed his outrage at not having been advised by Peck verbally of those findings.
We conclude that DeMeo was negligent in signing a discharge summary which reported the findings of the chest X-ray as unremarkable. If Peck's X-ray report was attached to the record, contrary to DeMeo's testimony, his failure to read that report and correctly record its findings was negligence. On the other hand, if the X-ray report was not contained in the hospital record, as DeMeo claims, he was negligent in recording chest X-ray findings which he had never seen, as unremarkable. In either event he was negligent, and the finding by the jury to the contrary was against the weight of the evidence presented. We realize that this negligence occurred in late October 1980. We express no opinion, however, as to any other prior or subsequent negligence of DeMeo nor whether any negligence of either DeMeo or Peck, or both, was a proximate cause of Jenoff's damages. These questions are left for determination by the jury.
The judgment in favor of Gleason is affirmed. The judgments in favor of Peck and DeMeo are reversed and remanded for a new trial.
NOTES
[1] The day before surgery the anesthesiologist made rounds of surgery patients and looked at the chest X-rays. Because the X-ray taken of Jenoff on September 14 could not be found when the anesthesiologist made her rounds in the afternoon of that day, she ordered a second chest X-ray which was taken on September 15, 1980.
[2] According to DeMeo, the report would then be returned to the record room and await attachment to the discharged patient's file. DeMeo claimed that as of October 27, 1980, when Jenoff's discharge summary was prepared, the X-ray reports were still not attached.
[3] The record does not reveal whether or not any chest X-rays were taken during that hospitalization and, if so, what they revealed.
[4] Prior to opening statements, all counsel stipulated to dismissal as to the Atlantic City Medical Center. The anesthesiologist was not named as a party defendant in either of the consolidated cases.
[5] All three defendants were insured by the same carrier.
[6] In his oral opinion denying plaintiffs' motion to vacate the dismissal as to Peck, the trial judge appears to have believed that Gleason had not testified until after plaintiffs had rested. This is not so, although it is true that DeMeo testified after plaintiff rested and the complaint was dismissed as to Peck. DeMeo testified that he was extremely upset upon learning the contents of Peck's radiology report, and that Peck's failure to tell him about it was medical negligence and a departure by Peck of the standard of care of a radiologist. DeMeo testified that he would have expected an immediate communication from Peck. In the course of his opinion denying plaintiffs' motion to vacate the dismissal as to Peck, the trial judge said:

Drs. DeMeo and Gleason arguably in depositions or in any event definitely as part of his case expressed an opinion contrary to Dr. Peck. And I will be frank, that causes me some concern. I am not happy in the situation where a physician is let out at the close of the plaintiffs' case and then the other remaining physicians take the opportunity to put the blame on the departed. I have some concern over that. But I also have to decide Dr. Peck's motion based on what was in the case at the time the proofs as against Dr. Peck.
[7] As noted, proximate cause was not addressed by the jury and remains a substantial issue in this case.