Dollie & Duane COURTEAU, Guardians of the Estate and Person of Timothy Courteau *v.* Doyne DODD, M.D.

89-105                                                  773 S.W.2d 436

Supreme Court of Arkansas
Opinion delivered July 3, 1989
[Rehearing denied September 11, 1989.*]

*Purtle, J., would grant rehearing.

*Perroni, Rauls & Looney, P.A.*, by: *Samuel A. Perroni* and *Stanley D. Rauls*, for appellants.

*Barber, McCaskill, Amsler, Jones & Hale, P.A.*, for appellee.

DAVID NEWBERN, Justice. This is a medical malpractice case decided by summary judgment in favor of defendant, Doyne Dodd, M.D., the appellee. The action was brought by the appellants, Dollie and Duane Courteau, on behalf of their son and ward, Timothy Courteau. Timothy, at age twenty, suffered a broken neck in a diving accident. While he was a patient at North Little Rock Memorial Hospital, a breathing tube which had been placed through his nostril into his trachea became dislodged. Breathing was severely hampered, blood gases elevated, and he suffered a heart attack and massive brain damage. Suit was brought on his behalf by the appellants, who are Timothy's parents and guardians, against three physicians and an insurance company. The allegation against Dr. Dodd, a radiologist, was that he failed to take immediate action to notify others involved in treating Timothy that an X-ray showed the tube was not present where it should have been. The trial court entered a final judgment as to Dr. Dodd, finding no reason to delay. Ark. R. Civ. P. 54(b). The Courteaus argue the remaining fact issue is whether the doctor used the proper means of communication. They assert it is a question a juror could answer absent expert testimony. We agree, however, with the court's conclusion that, absent the prospect of expect medical testimony showing Dr. Dodd to have been negligent, there was no remaining fact issue, and summary judgment was appropriate.

Facts revealed in the pleadings and affidavits supporting and responding to the summary judgment motion are not disputed. Timothy Courteau was admitted to the hospital on July 3, 1986. Following surgery necessitated by his spinal injury he was placed

on a respirator, and the tube was put in place to keep an air passageway open to his lung. The nursing notes beginning on the night of July 5, 1986, showed the patient was agitated and was fighting the ventilator and shaking his head from side to side.

A nurse checked between 6:00 and 7:30 a.m. on the morning of July 6 and found there was a whistling sound around the tube and the patient was unresponsive. At about that same time, a respiratory therapist reported the blood gases were at readings of around 90, and they should have been around 30. The therapist caused a call to be made to Dr. Marvin, the treating physician, who then ordered that the tube be repositioned. Dr. Duke tried unsuccessfully to get the tube back into the lung, using both the nostril and the mouth, but instead the tube went into the esophagus and stomach. Timothy's inability to breathe resulted in the brain damage and a heart attack which occurred at 8:59 a.m.

Requisitions had been made for daily chest X-rays. The requisition dated July 3 for a July 4 X-ray made no reference to the tube. Dr. McAdoo, who read the July 4 film, stated in his notes "[t]here is an endotracheal tube in place." The requisition dated July 4 for the July 5 X-ray again made no mention of the tube, and Dr. McAdoo's notes did not mention the tube. The requisition dated July 5 for the July 6 X-ray had two notations: "CHEST-PORTABLE RECUMBENT" and "INTUBATION."

Dr. Dodd's affidavit accompanying the motion for summary judgment stated that he read the film between 7:30 and 8:30 the morning of July 6. The Courteaus point out that in his earlier deposition Dr. Dodd said he read the film between 7:15 and 8:30. The X-ray had been taken at 6:35 that morning. He noted the absence of the tube, stating, "the endotracheal tube is not visualized and may have been removed." His dictated notes were transcribed and printed at 10:37 that morning. He took no other action to notify anyone of the finding that the tube was not in place. In his affidavit Dr. Dodd described the X-ray requisition as "routine" with nothing to suggest urgency with respect to his report. He also noted there was nothing unusual about the disappearance of a tube or other appliance which may be removed as a patient's condition improves.

Also accompanying the motion for summary judgment were

affidavits of two board certified radiologists, each of whom stated he was familiar with the standard of care for radiologists practicing in the Little Rock and North Little Rock community in 1986. Each stated that he had reviewed the undisputed facts and concluded that Dr. Dodd promptly read the X-ray in question and interpreted it in a manner consistent with the standard of care for a radiologist in the community in 1986. Each stated:

> It is my professional medical opinion that Dr. Dodd did not negligently fail to bring his endotracheal tube finding regarding Tim Courteau's July 6, 1986, morning chest x-ray to the attention of the treating physician, the intensive care unit, the emergency room, or hospital administration, as alleged in . . . plaintiffs' . . . Complaint. Dr. Dodd dictated a report which indicated that "the endotracheal tube is not visualized and may have been removed." No request for a STAT reading was communicated to Dr. Dodd. It was within the standard of care for a radiologist who read a routine chest x-ray on a patient who had been intubated in the intensive care unit for several days to dictate his findings that no tube appeared in the x-ray. This is true even though the requisition indicated that the patient was intubated, because the computer-generated requisitions often indicated the presence of tubes or appliances which had been removed as the patient's condition improved.

In response to the motion for summary judgment, the Courteaus presented, among other things, excerpts from a number of depositions concerning the direct care which was being given in or about the patient's hospital room. The only items, other than the X-ray films, directly related to Dr. Dodd were an excerpt from a deposition given by an internist, Dr. Frank Logan Brown, Jr., and an affidavit from a respiratory therapist, John Govar.

Dr. Brown expressed no opinion about the standard of care and whether Dr. Dodd's actions were within the standard. He stated he did not understand why Dr. Dodd had not called the intensive care unit where the patient was hospitalized when he noticed the tube was not present, given the "intubation" notation on the requisition.

Mr. Govar's affidavit stated that he was a certified respiratory therapist with twelve years experience, currently serving as Director of Respiratory Care at Hillside Hospital in Pulaski, Tennessee. The affidavit contained nothing about Mr. Govar's education or training for his position. There was nothing showing the size or nature of the community in which he was working or any community in which he had worked. There was nothing to show any knowledge of radiology or X-ray reading and reporting procedures. He stated that in his experience "a chest x-ray requisition reflecting the word 'intubation' means that a chest x-ray is being requested for the purpose of determining tube placement." He stated his opinion that the absence of the tube shown in the July 6 film should have been reported immediately.

After finding that a genuine issue of material fact remained as to the question of causation, the trial court's order stated:

> However, it is the Court's opinion that in this case the Plaintiffs would have to have expert medical testimony and opinion that Dr. Dodd acted below the standard of care for radiologists in 1986 in North Little Rock, Arkansas, or a similar community, and that Plaintiffs have not listed a medical physician who would so testify, and, therefore, there is not a genuine issue of material fact concerning Dr. Dodd's alleged negligence.

■■ In *Prather* v. *St. Paul Ins. Co.*, 293 Ark. 547, 739 S.W.2d 676 (1987), we reversed a summary judgment because we found ample medical expert testimony to raise a question of fact as to a physician's negligence. We stated the standard rule for review of a summary judgment. The burden is on the moving party to demonstrate that there is no genuine issue of fact for trial. We view the evidence most favorably to the party against whom relief is sought. Citing *Clemons* v. *First National Bank,* 286 Ark. 290, 692 S.W.2d 222 (1985), we said summary judgment is not proper where the evidence is not in dispute but has aspects from which inconsistent hypotheses might reasonably be drawn.

The malpractice statute, Ark. Code Ann. § 16-114-206(A) (1987), provides:

> In any action for medical injury, the plaintiff shall have the burden of proving:

(1) The degree of skill and learning ordinarily possessed and used by members of the profession of the medical care provider in good standing, engaged in the same type of practice or specialty in the locality in which he practices or in a similar locality;

(2) That the medical care provider failed to act in accordance with that standard; and

(3) That as a proximate result thereof, the injured person suffered injuries which would not otherwise have occurred.

The question here is whether, once Dr. Dodd presented medical expert opinion testimony to the effect that he was not negligent, the Courteaus presented sufficient evidence to pose a question of fact on that issue. Further refined, the question becomes whether the affidavit of Mr. Govar expressing his opinion that Dr. Dodd was negligent was sufficient to rebut Dr. Dodd's evidence and thus raise a fact question.

██ To the extent the trial court's judgment could be interpreted as stating that the Courteaus were required to find a radiologist to testify against Dr. Dodd and to rebut the affidavits of his fellow radiologists, we disagree. Arkansas Code Ann. § 16-114-207(1) (1987) provides that A.R.E. 702 governs the qualifications of expert witnesses in an action for medical injury. Rule 702 is not so strict. We have held that if there is a reasonable basis for saying a witness knows more of the subject at hand than a person of ordinary knowledge, his evidence is admissible. *Dildine v. Clark Equip. Co.*, 282 Ark. 130, 666 S.W.2d 692 (1984). By way of *obiter dictum* in *Haney* v. *DeSandre*, 286 Ark. 258, 692 S.W.2d 214 (1985), we stated that:

the statute does not expressly state that every plaintiff in a malpractice case must find a doctor willing to testify against a fellow doctor. Such a requirement might subject the validity of the statute to serious doubt, as being special or class legislation. ⁻

Reserving the question whether educational background is a necessary component of the qualifications of a person presented as a medical expert, Mr. Govar's affidavit makes it pretty clear that he is a person who may have more knowledge than the

ordinary person would have about respiratory therapy. It states:

> [t]he respiratory therapy issues in this case relating to the proper and standard care to be provided to an intubated patient in the Intensive Care Unit are common to any hospital operating such a unit. The issues involve the basic components of airway management of an intubated patient in the Intensive Care Unit.

It then states that "intubation" noted on a requisition means a chest X-ray is being requested to determine tube placement, and that the findings from the 6:35 a.m. film were of major significance to the patient's care and should have been immediately reported. Had the issue in this case been one of the standard of care to be exercised in administering respiratory therapy, and had Mr. Govar been able to qualify as an expert in that field, his testimony might have been sufficient to present a fact question. The subject at hand here, however, was the standard of care a radiologist must follow in interpreting an X-ray requisition.

The question we face is whether Mr. Govar was qualified to express an opinion about how Dr. Dodd should have reacted to the July 6 X-ray, given the instructions in the July 5 requisition. The affidavit offers nothing to sustain the Courteaus' burden of proof which, in the words of § 16-114-206(A)(1), includes "[t]he degree of skill and learning ordinarily possessed and used by members of the profession of the medical care provider . . . engaged in the same type of . . . specialty in the locality . . . or . . . similar locality." Mr. Govar's affidavit contained nothing about his having knowledge as to how a radiologist in a community like North Little Rock should have interpreted the July 5 requisition. His statement that the "respiratory care issues" are common to any hospital operating an intensive care unit states no basis for his evaluation of the conduct of a radiologist.

The Corteaus cite *Phillips* v. *Good Samaritan Hosp.*, 65 Ohio App.2d 112, 416 N.E.2d 646 (1979). There a radiologist determined that the patient had a broken arm, although the physician who had examined her had concluded there was no break. The radiologist dictated his findings into a machine, but they were not communicated to the treating physicians. The Courteaus urge upon us the language from that case to the effect

that the "mode" of communication is an area in which an ordinary juror could ascertain whether the radiologist breached a duty to the patient. We find, however, that the court carefully and clearly distinguished the "urgency" of the communication which the court concluded depended on medical facts as to which expert testimony would be required.

The Courteaus also cite *Jenoff* v. *Gleason*, 215 N.J. Super. 349, 521 A.2d 1323 (App. Div. 1987), where the mode of communication by a radiologist resulted in delay in informing a patient and her physician about a lung tumor until it had grown and spread. The information was not placed in the hands of Ms. Jenoff's doctors but was attached to her hospital records after she had been discharged. It was only discovered by a nurse who was reviewing her record on behalf of a workers' compensation carrier some months later. The trial court dismissed the claim against the radiologist at the conclusion of the plaintiff's evidence. A physician testified that an unusual finding by a radiologist would be communicated to the treating physician and where, as in the case of Ms. Jenoff the X-ray was being taken to assess her general suitability for surgery, to the surgeon. The appellate court reversed on the ground that the evidence was sufficient to take the case to the jury. By way of *obiter dictum*, the court noted that "modes of communication are not so peculiarly within the expertise and knowledge of the medical profession as to necessitate expert testimony."

The Jenoff case is easily distinguishable from the one before us now. We agree that the discovery of a lung tumor by a radiologist is clearly an item to be communicated to a treating physician and patient, and a layperson could determine that failure to communicate in those circumstances could be characterized as negligence. In this case, however, there was no failure to communicate. Unlike the *Jenoff* case, the jurors here would have had the task of interpreting the term "intubation" and determining the action, if any, it required under the community standard made applicable by the statute.

In *Prater* v. *St. Paul Ins. Co., supra,* we wrote:

> Expert testimony is required when the asserted negligence does not lie within the jury's comprehension; when the applicable standard of care is not just a matter of

common knowledge; and when the jury must have the assistance of expert witnesses to decide the issue of negligence. *Sexton* v. *St. Paul Fire & Marine Insurance Co.*, 275 Ark. 361, 631 S.W.2d 270 (1982); *David* v. *Kemp*, 252 Ark. 925, 481 S.W.2d 712 (1972).

■ Again, the question presented has to do with the urgency, if any, suggested by the X-ray requisition and the resulting film, and we cannot say the trial court was wrong in requiring expert testimony on that issue and in holding that Mr. Govar's affidavit was insufficient and the "question" raised in the deposition testimony of a physician presented no genuine issue of material fact.

Affirmed.

HOLT, C.J., PURTLE and GLAZE, JJ., dissenting.

JOHN I. PURTLE, Justice, dissenting. We should abandon the archaic rule that dictates that before an injured person may proceed against a physician, he must have another physician who is willing to testify that the treating physician did not use the degree of care required. One of the basic instructions given to the jury is: "In considering the evidence in this case you are not required to set aside your common knowledge, but you have a right to consider all evidence in the light of your own observations and experiences in the affairs of life." AMI Civil 3rd 102. If a jury is urged not to set aside its common knowledge, then certainly the admonition should apply with equal force to the courts. Our court-made rule requiring a physician to testify against another in support of a plaintiff's claim is, at the very least, obsolete. In view of the existence of special legislation protecting doctors from certain risks, we ought to subject physicians to all other normal risks encountered by other professions.

The majority opinion is well-written and contains all the facts necessary to understand this case. My disagreement is not so much with the majority as it is with the practice which has grown up protecting the medical profession from liability for negligence. For example, in the present case two board-certified radiologists testified, relative to the motion for summary judgment, that the appellee, also a board-certified radiologist, did things in conformity with the standards prevailing in the community where the

hospital is located. It would surprise me if all other board-certified radiologists in the city would not make the same statement. However, the ultimate decision in this case should not be left to a radiologist.

Timothy Courteau was in grave condition when he was placed in the intensive care unit at Memorial Hospital on July 3, 1986. It was deemed necessary to insert a tube into his lungs, through the trachea, to enable him to receive sufficient oxygen. He was then placed on a ventilator to assist him in breathing. One of the routine orders was that Tim would have a daily X-ray in the morning for the purpose, among other things, of determining whether the tube was in place. When the tube is properly inserted, the condition is referred to as "intubation." When the tube is not in place the condition is called "extubation."

The X-rays were read each morning between 7:30 a.m. and 8:00 a.m. Until July 6, 1986, the early morning X-rays clearly revealed that Tim had the breathing tube in place. The requisitions for the July 6 early morning X-ray required a reading for intubation. The early morning X-ray of July 6, 1986, was read by Dr. Dodd between 7:15 a.m. and 8:30 a.m. The remarkable thing about this X-ray is that it is obvious, even from the photo copy in appellant's briefs, that the tube is missing from his throat. Dr. Dodd's report alluded to the missing tube by stating that it "may have been removed." One of Dr. Dodd's partners, Dr. Dalrymple, stated that ICU X-rays at the North Little Rock Memorial Hospital were to be given priority reading and were not to be handled as "routine" X-rays. However, the reading of this X-ray by Dr. Dodd at about 8:00 a.m. was not received at Tim's station until 10:37 a.m. In the meantime, Tim had suffered a cardiac arrest.

It seems to me that it does not take the testimony of another radiologist to explain that the breathing tube had been dislodged from the patient's thoratic area prior to the taking of the X-ray on July 6, 1986. Compared with the X-rays of July 4 and 5, it is obvious to the normal eye that the tube is not in place. Knowing that the tube was not in place, the doctor nevertheless handled the situation as a matter of routine. While this routine was taking its course, Timothy Courteau was in a life-threatening situation and indeed almost died. He deserved more than routine care under

these circumstances.

Even before the report of the X-rays came back to the patient's chart, the duty nurses had discovered he was extubated. In the attempt to replace the tube it was inserted through the esophagus into the stomach. Certainly this series of mishaps was not planned by the institution or any of its employees. I doubt that any employee or staff member of the hospital, from attending physician to janitor, would have failed to recognize that something needed to be done when it was discovered that the tube was not in place. The requisition for the X-ray stated that one purpose was to determine whether the patient was intubated. It does not take expert medical testimony to recognize that this fact should be immediately called to the attention of those entrusted with preserving the life of the patient. This was not done. Rather, this most significant and alarming fact was not called to the attention of anyone except through routine channels.

It is quite clear to me that the evidence in this case reveals certain aspects from which inconsistent hypotheses might reasonably be drawn. In other words, reasonable men might differ on the interpretation of the evidence. In the case of *Prater v. St. Paul Fire and Marine Insurance Co.*, 293 Ark. 547, 739 S.W.2d 676 (1987), this court stated:

> Expert testimony is required when the asserted negligence does not lie within the jury's comprehension; when the applicable standard of care is not a matter of common knowledge; and when the jury must have the assistance of expert witnesses to decide the issue of negligence.

The jury did not need the testimony of an expert witness to interpret the facts in this case. The question boils down to whether Dr. Dodd was negligent in failing to communicate the extubated condition of Timothy Courteau. Aside from the fact that it is most difficult to find a physician who is willing to testify against another physician, it is clear from the facts in this case that the jury could have made a determination on the question of the appellee's negligence. See *Haney v. DeSandre*, 286 Ark. 258, 692 S.W.2d 214 (1985).

Even though we may not have decided this precise factual question before, we have decided the same issue many times. I

have cited two cases and will point to several others from other jurisdictions. The finding of a radiologist concerning X-rays has been held not to be a matter so peculiarily within the expertise and knowledge of the medical profession as to require expert testimony. *Phillips* v. *Good Samaritan Hospital*, 416 N.E.2d 646 (Ohio App. 1979); *Jenoff* v. *Gleason*, 521 A.2d 1323 (N.J. Super. A.D. 1987); *Thomas* v. *Corso*, 288 A.2d 379 (Md. 1972); *Baldwin* v. *Knight*, 569 S.W.2d 450 (Tenn. 1978); *Wilkinson* v. *Vesey*, 295 A. 2d 676 (R.I. 1972); *Steele* v. *Woods*, 327 S.W.2d 187 (Mo. 1959); and *Prater* v. *St. Paul*, supra. When a patient is in peril of his life, it does him very little good if the examining doctor has discovered his condition unless the physician takes measures and informs the patient, or those responsible for his care, of that fact.

The director of respiratory therapy at the hospital testified that the procedures involved in this case are common to any hospital furnishing such services. The director had twelve years' experience in respiratory therapy. He was familiar with the X-ray procedures normally employed to determine the proper placement of breathing tubes. He stated that the purpose of a requisition requesting an X-ray to be read for intubation was to see whether the breathing tube was still in place. It was obvious to him from observing the X-ray of July 6 that the tube was not in place.

An attending physician who found Timothy in a life-threatenting situation obviously recognized the need for immediate attention and attempted to replace the respiratory tube. However, she mistakenly inserted the tube in his esophagus, thereby aggravating the patient's already precarious situation.

The holding in *Phillips* v. *Good Samaritan Hospital*, supra, was that:

> Modes of communication . . . are not so peculiarily within the expertise and knowledge of the medical profession so as to necessitate expert testimony. The manner of communication, unlike urgency and content that depend upon medical facts, is not so complex and technical that is should escape the comprehension of a layman jury. In so holding, we merely apply the general principle that a party need not "submit expert testimony in order to have the case submit-

ted to the jury, where [a] violation of the defendant's duty to the patient is otherwise made to appear." (Citation omitted.) Once the need for a communication, and the necessary information that it should contain, have been established, the trier of fact should be able to pass on the issue of adequacy of the communication bearing in mind the facts available to the parties at the time the communication was made.

It seems to me that common knowledge is all that is needed to determine that the X-rays of July 6, taken at 6:35 and read by Dr. Dodd about an hour later, clearly demanded that the extubation required immediate attention rather than the normal routine. Had the X-rays been read in the ICU unit when Dr. Duke or Dr. Bates arrived, the cardiac arrest most likely would not have occurred. Dr. Bates stated that the available evidence indicated that Timothy Courteau was in a life-threatening situation at 7:15 a.m., about an hour after the X-ray had been taken.

If we must continue to employ the archaic rule requiring one physician to testify against another, it seems to me that Dr. Bates' testimony is factual enough to demand that the matter be submitted to a jury for determination. Common sense requires that a jury be allowed to decide the issue of negligence and proximate cause in medical malpractice cases as well as in all other cases.

HOLT, C.J., joins in this dissent.