IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

Opinion Number: _____

Filing Date:  September 18, 2014

Docket No. 33,770

Diego Zamora as Personal
Representative of the Estate of
WILLIAM "MACK" VAUGHAN,

         Plaintiff-Petitioner,

v.

ST. VINCENT HOSPITAL,

         Defendant-Respondent.

ORIGINAL PROCEEDING ON CERTIORARI
Barbara J. Vigil, District Judge

Tucker Law Firm, P.C.
Steven L. Tucker
Santa Fe, NM

Law Office of Stephen Durkovich
Stephen G. Durkovich
Santa Fe, NM

for Petitioner

Hinkle, Hensley, Shanor & Martin, LLP
William P. Slattery
Dana Simmons Hardy
Santa Fe, NM

for Respondent

OPINION

DANIELS, Justice.

1

**{1}** In this medical negligence case, we reaffirm New Mexico's longstanding commitment to the nontechnical fair notice requirements of Rule 1-008 NMRA, "General rules of pleading." Plaintiff William "Mack" Vaughan alleges that, as the result of a communication failure between a surgeon and a contract radiologist, Defendant St. Vincent Hospital failed to tell Vaughan about his cancer diagnosis. The district court granted summary judgment for St. Vincent because Vaughan did not specifically plead vicarious liability relating to the radiologist, St. Vincent's apparent agent, and failed to establish a genuine issue of material fact through expert testimony. We reverse and remand, holding that Vaughan's complaint adequately notified St. Vincent that one or more of its employees or agents was negligent and that genuine issues of material fact required resolution at a trial on the merits.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

**{2}** In August 2002, Vaughan presented to the emergency room at St. Vincent Hospital in Santa Fe, New Mexico, with symptoms that included abdominal pain. He was examined by emergency department physician Martin Wilt and surgeon Anna Voltura. Radiologist J.R. Damron, a contract employee, performed an abdominal scan on Vaughan and interpreted the results. Damron's initial conclusion was that Vaughan had a diverticular abscess, and although Damron discussed this diagnosis in person with Voltura, it is unclear whether he and Voltura discussed the possibility of a neoplasm (cancer). Voltura conveyed the diverticulitis diagnosis to Vaughan and recommended that he be admitted to the hospital for observation. Vaughan refused and was discharged from the emergency room. Voltura also advised Vaughan to follow up with her for a sigmoid colectomy (removal of the left part of the colon), although he never did.

**{3}** Damron dictated his radiology report, dated the day after Vaughan's visit, to a hospital transcriber. In his report, Damron noted that "[a]n abscess associated with a diverticulitis would be a first consideration *with neoplasm as the etiology being the second consideration.*" (Emphasis added.) The impression section of Damron's report read, "Pelvic abscess . . . approximates 4.5 x 3 cm in size. The results of this study were communicated to Dr. Wilt and Dr. Voltura." The radiology report does not indicate whether copies were delivered to either Wilt or Voltura. In a sworn statement, Voltura said that she did not receive the report noting the secondary neoplasm diagnosis and that she would have expected to receive it. Voltura stated that had she seen the word "neoplasm" in the report, she "would have tried to do whatever [she] could to get ahold of the patient." Vaughan was diagnosed with Stage III colon cancer fourteen months later.

**{4}** In January 2006, Vaughan filed a complaint against St. Vincent alleging, "As a consequence of the apparent failure by St. Vincent's Hospital through an administrative inadequacy to forward the radiology report on to Dr. Voltura, Mr. Vaughan was treated for a diverticular abscess with antibiotics, allowing the neoplasm to continue to grow." St. Vincent sent Vaughan interrogatories requesting, among other things, the identity of any experts he planned to call. Vaughan responded by saying, "No decisions have been made on

2

experts at this time. In any event, expert testimony is probably not required in this case." In June 2009, St. Vincent filed a motion for summary judgment, attaching the affidavit of emergency medicine physician Mark Kozlowski, who offered his expert opinion that "St. Vincent Hospital complied with the standard of care in its treatment of Mr. Vaugh[a]n." St. Vincent pointed out that Vaughan had not identified an expert witness to establish the standard of care for communicating a radiologist's diagnosis to physicians and surgeons. St. Vincent also emphasized that Vaughan did not have an expert to establish whether the delay in the cancer diagnosis caused Vaughan's injury. In a supplemental memorandum in support of its motion for summary judgment, St. Vincent argued that Vaughan "was required to assert vicarious liability or apparent agency allegations in his complaint if he intended to recover damages from St. Vincent under that theory."

**{5}** In response to the summary judgment motion, Vaughan argued that Kozlowski's opinion was flawed because he had not been informed of Voltura's sworn statement that she would have proceeded differently if she had received Damron's transcribed radiology report. Vaughan filed his own motion for summary judgment in October 2009, including an affidavit from John Bagwell, Vaughan's treating oncologist in 2003, stating that the fourteen-month delay in treatment had a significant negative impact on Vaughan's chances of survival. Vaughan also filed an amended summary judgment motion, relying on an affidavit from radiologist Donald Wolfel. "It is absolutely the standard of care that a radiologist reading a diagnostic film communicate the results of his diagnostic impression to the physicians known to be managing the care of the patient," Wolfel stated in his affidavit, "particularly so when the observed condition is considered urgent or potentially cancerous."

**{6}** The district court entered summary judgment for St. Vincent, finding that (1) Vaughan's complaint did not provide St. Vincent with notice that Damron, a contract employee, was negligent and that St. Vincent was vicariously liable for Damron's negligence, (2) Vaughan's claim required expert testimony, which he did not provide, to establish the standard of care, and (3) Vaughan's discovery responses also failed to provide St. Vincent with sufficient notice and failed to identify an expert witness to support his claim.

**{7}** Vaughan appealed, and the Court of Appeals affirmed the district court's ruling for summary judgment. *See Vaughan v. St. Vincent Hospital*, No. 30,395, mem. op. at 2 (N.M. Ct. App. Apr. 16, 2012) (nonprecedential). The Court of Appeals held that under Rule 1-008, Vaughan gave St. Vincent insufficient notice of its vicarious liability for any negligence by Damron, *Vaughan*, No. 30,395, mem. op. at 2, 19, and that Vaughan failed to establish evidence supporting any breach of duty by St. Vincent under any standard of care—be it ordinary or medical negligence, *id.* at 2, 21-22. We granted certiorari to address those rulings. *See* 2012-NMCERT-010.

## II.     DISCUSSION

3

**{8}**     Vaughan argues that summary judgment was improperly granted because his pleading was sufficient under Rule 1-008 to put St. Vincent on notice of any direct or vicarious liability and because his affidavits raised genuine issues of material fact as to St. Vincent's negligence. St. Vincent disagrees, contending that because Vaughan failed to provide St. Vincent with notice of any potential vicarious liability for Damron and failed to establish a genuine issue of material fact regarding his claim, summary judgment was appropriate. We agree with Vaughan. Vaughan's pleading was sufficiently detailed to put St. Vincent on notice of a claim of apparent agency or vicarious liability related to the failure to communicate his cancer diagnosis, and the affidavits supporting Vaughan's claims raise several genuine questions of material fact regarding St. Vincent's negligence. Vaughan provided expert testimony regarding St. Vincent's duty and breach of duty, Vaughan's injury, and St. Vincent's role in causing that injury, and we do not need to rely on a distinction between ordinary and medical negligence.

**{9}**     This Court's review of orders granting or denying summary judgment is de novo. *United Nuclear Corp. v. Allstate Ins. Co.*, 2012-NMSC-032, ¶ 9, 285 P.3d 644. Summary judgment is appropriate in the absence of any genuine issues of material fact and where the movant is entitled to judgment as a matter of law. *Montgomery v. Lomos Altos, Inc.*, 2007-NMSC-002, ¶ 16, 141 N.M. 21, 150 P.3d 971; Rule 1-056(C) NMRA. In reviewing an order on summary judgment, we examine the whole record on review, considering the facts in a light most favorable to the nonmoving party and drawing all reasonable inferences in support of a trial on the merits. *Handmaker v. Henney*, 1999-NMSC-043, ¶ 18, 128 N.M. 328, 992 P.2d 879. "New Mexico courts, unlike federal courts, view summary judgment with disfavor, preferring a trial on the merits." *Romero v. Philip Morris Inc.*, 2010-NMSC-035, ¶ 8, 148 N.M. 713, 242 P.3d 280. The district court's determination that the testimony provided by Vaughan did not satisfy the requirement for expert testimony is a conclusion of law and is also subject to de novo review. *See State v. Torres*, 1999-NMSC-010, ¶¶ 27-28, 127 N.M. 20, 976 P.2d 20 ("[W]hether the trial court applied the correct evidentiary rule or standard [concerning expert testimony] is subject to de novo review on appeal.").

**A.     Vaughan's Complaint Provided St. Vincent with Sufficient Notice That It Was Vicariously Liable for the Actions of Its Employees and Agents**

**{10}**     Throughout the past seventy-five years, this Court has maintained our state's notice pleading requirements, emphasizing our policy of avoiding insistence on hypertechnical form and exacting language. *See Malone v. Swift Fresh Meats Co.*, 1978-NMSC-007, ¶ 10, 91 N.M. 359, 574 P.2d 283 ("[T]he principal function of pleadings is to give fair notice of the claim asserted."). Nationally, the preference for nontechnical fair notice pleading received strong support with the adoption of the Federal Rules of Civil Procedure in 1938, "signal[ing] the end of fact pleading in federal court and the approval of notice pleading, . . . with the contemplation that the facts would be developed during discovery proceedings and the theory of the case set forth in the pretrial memorandum." *Malone*, 1978-NMSC-007, ¶ 10 (omission in original) (internal quotation marks omitted) (quoting *Matlack, Inc. v. Hupp Corp.*, 57 F.R.D. 151, 159 (E.D. Pa. 1972)). When New Mexico adopted the Federal Rules

4

four years later, in 1942, we became one of the first states in the country to endorse the simplified notice pleading standard. *See* Jerrold L. Walden, *The "New Rules" in New Mexico: Some Disenchantment in the Land of Enchantment*, 1 Nat. Resources J. 96, 96-97 (1961) (republished from 25 F.R.D. 107, 107-09 (West 1960)).

**{11}** The rationale for nontechnical notice pleading—resolution of disputes on their merits, *see id.* at 97—is so broadly accepted today that many take it for granted. This was not always the case. In 1961, nearly twenty years after the advent of notice pleading in New Mexico, the relaxed standard was still regarded as a progressive "movement":

> One of the most accurate measures of the success of any procedural reform movement is the extent to which judicial decisions rest upon the merits of controversies rather than upon technical niceties of written documents artifacted by attorneys before trial. Common law pleading with its extreme dialecticism almost guaranteed against this ever occurring except through sheer perseverance or chance. The rigid demands exacted by the Codes for fact pleading and the resurrection of the forms of action constituted, if anything, mere token improvement. The Federal Rules, on the other hand, provide a refreshing contrast, for nothing could be better designed to eliminate unnecessary controversy over pleadings than the simple requirement that the pleader state his claim for relief in plain terms, short and to the point.

*Id.* at 97.

**{12}** In the ensuing decades, New Mexico's appellate courts have gone to great lengths to keep the path to justice clear for all who would use it, regardless of their familiarity with the law. "Since the early adoption of the Federal Rules of Civil Procedure in New Mexico, our courts have recognized that the principal function of pleadings is to give fair notice of the claim asserted." *Malone*, 1978-NMSC-007, ¶ 10. "[I]t is sufficient that defendants be given only a fair idea of the nature of the claim asserted against them sufficient to apprise them of the general basis of the claim; specific evidentiary detail is not required at [the complaint] stage of the pleadings." *Petty v. Bank of N.M. Holding Co.*, 1990-NMSC-021, ¶ 7, 109 N.M. 524, 787 P.2d 443.

> "[The rules of civil procedure] were designed in large part to get away from some of the old procedural booby traps which common-law pleaders could set to prevent unsophisticated litigants from ever having their day in court. If rules of procedure work as they should in an honest and fair judicial system, they not only permit, but should as nearly as possible guarantee that bona fide complaints be carried to an adjudication on the merits."

*Martinez v. Segovia*, 2003-NMCA-023, ¶ 12, 133 N.M. 240, 62 P.3d 331 (alteration in original) (citation omitted). "The Rules of Civil Procedure disfavor looking upon pleadings

5

as tests of skill where a single misstep could bar recovery." *Mendoza v. Tamaya Enters., Inc.*, 2010-NMCA-074, ¶ 15, 148 N.M. 534, 238 P.3d 903.

**{13}** Today the basic guidelines for pleading claims in New Mexico can be found in Rule 1-008, which states that any claim for relief shall contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Rule 1-008(A)(2). Rule 1-008 also provides that "[e]ach averment of a pleading shall be simple, concise and direct," Rule 1-008(E)(1), and that "[a]ll pleadings shall be so construed as to do substantial justice," Rule 1-008(F).

**{14}** There is nothing in either our Rules of Civil Procedure or the New Mexico Statutes that requires a civil complaint to specifically recite reliance on theories of vicarious liability or apparent agency in order to provide fair notice of a cause of action. *Cf. Dessauer v. Mem'l Gen. Hosp.*, 1981-NMCA-051, ¶ 29, 96 N.M. 92, 628 P.2d 337 ("The doctrine of vicarious liability was fashioned to provide a remedy to the innocent plaintiff, not to furnish a windfall to a solvent wrongdoer."). St. Vincent was adequately informed of the general nature of Vaughan's claim from the outset. Vaughan's complaint highlighted the key facts and actors relevant to his cause of action, emphasizing the negligent breakdown in communication for which St. Vincent was ultimately responsible: "Whatever was said in the conversation [between Damron and Voltura], the radiology report itself was apparently never sent by St. Vincent's Hospital to Dr. Voltura or to Dr. Wilt." The unfortunate result is that St. Vincent's diagnosis of possible colon cancer was never communicated to Vaughan and apparently not even to the treating doctors. While St. Vincent argues that Vaughan's complaint "does not establish the basis for a claim of vicarious liability relating to Dr. Damron or provide St. Vincent with notice of such a claim," this requirement qualifies as one of the "technical niceties" or "procedural booby traps" New Mexico left behind more than seventy years ago. We do not dispute St. Vincent's contention that Vaughan's complaint is rudimentary. Upon viewing it, the district court exclaimed, "Boy, this . . . Complaint is quite simple." Vaughan refers to St. Vincent's failure to forward the radiological report to Voltura as "negligent" and alternatively as "administrative[ly] inadequa[te]." Additionally, it fails to name a theory of vicarious liability, but the reality is that New Mexico's pleading standards require no more detail than Vaughan provided.

**{15}** It is apparent from St. Vincent's answer to Vaughan's first amended complaint that the hospital was on notice of the general nature of Vaughan's claim:

> If Dr. J.R. Damron failed to communicate the diagnostic possibilities contained in his August 8, 2002, report to Dr. Martin Wilt and Dr. Anna Voltura, that failure by Dr. Damron constituted medical negligence, which caused injury to plaintiff. Such medical negligence by Dr. Damron constitutes comparative negligence, reducing any negligence by St. Vincent, which is denied.

Because St. Vincent was adequately apprised of the nature of Vaughan's claim against it that

someone in St. Vincent's sphere of responsibility failed to communicate vital medical information from a radiology report, it was immaterial that the complaint failed to specify which particular agents were negligent or which theory of agency resulted in liability on the part of St. Vincent.

**{16}** The policy behind notice pleading is to alert potential parties to pending lawsuits, and "general allegations of conduct are sufficient." *Schmitz v. Smentowski*, 1990-NMSC-002, ¶ 9, 109 N.M. 386, 785 P.2d 726. *Schmitz* offers a litmus test for whether defendants are able to anticipate the charge and present a defense: "It is insufficient for [the defendants] to complain that they did not recognize the theory underlying the allegations, and, in fact, they were apprised of [a plaintiff's] theory." *Id.* ¶ 12. Here, St. Vincent's affirmative defense quoted above was one of many indicating that it recognized the theory underlying the allegations.

**{17}** Our Court of Appeals addressed a similar scenario in *Houghland v. Grant*, a medical malpractice case concerning care in an emergency room where the physicians were provided by a contractor. *See* 1995-NMCA-005, ¶¶ 1, 4, 119 N.M. 422, 891 P.2d 563 (holding that whether a hospital is vicariously liable for the alleged malpractice committed by independent contractor physicians in the hospital's emergency room raises genuine issues of material fact). In *Houghland*, the plaintiff patient claimed that the defendant hospital was vicariously liable for the malpractice of the contract physicians in its emergency room without formally pleading a theory of apparent agency. *See id.* ¶ 14. The district court granted summary judgment for the hospital. *Id.* ¶ 6. The Court of Appeals reversed and remanded, holding that a jury could have found an apparent agency relationship existed between the hospital and the contractor physicians based on the hospital's conduct, *id.* ¶ 18 ("When a doctor renders care in [a hospital's] emergency room, the appearance is that [that hospital] is rendering that care."), and on the plaintiff's "justifiable reliance" on that conduct, *id.* ¶¶ 18, 22 ("Patients seeking care from a hospital emergency room are particularly not in a position to make inquiries into the contractual relationships between the hospital and its emergency room doctors.").

**{18}** Under *Houghland*, a malpractice claim arising from care in a hospital emergency room implicates the hospital in the actions of any employees or agents—known or unknown to the plaintiff—who took part in that care. "The very nature of a medical emergency dictates that hospitals providing emergency room services be held responsible for the actions of professionals providing such care when the elements of apparent authority are established." *Id.* ¶ 22. The Court of Appeals determined that "[a]lthough [the p]laintiff's argument was not entirely clear, we believe that her factual and legal presentation below was sufficient to alert the district court to an issue of fact on the question of apparent or ostensible agency." *Id.* ¶ 14.

**{19}** The Court of Appeals reached a similar holding in *Baer v. Regents of Univ. of Cal.*, where the plaintiff lost his malpractice claim in the district court on summary judgment in part because he did not specifically argue vicarious liability and failed to include in the

7

underlying complaint the name of a physician's assistant employed by the defendant. *See* 1994-NMCA-124, ¶¶ 1, 20, 118 N.M. 685, 884 P.2d 841. The Court of Appeals reversed, concluding that the defendant received fair notice and that genuine issues existed as to whether the defendant was vicariously liable because the complaint mentioned the defendant and "'other medical personnel'" employed by the defendant. *See id.* ¶¶ 20-21. Because an "'entity or agency can only act through its employees,'" *id.* ¶ 21 (citation omitted), the complaint inherently gave the defendant fair notice: "[T]he vicarious liability issue [was] raised by the facts of th[e] case," *id.* ¶¶ 17, 21. The Court of Appeals concluded that "[a]lthough less than sweeping, [the plaintiff's] pleadings give adequate notice that one of [the p]laintiff's theories of the case against [the defendant] is vicarious liability. . . . Further, the complaint contains enough to support the legal theory argued on appeal." *Id.* ¶¶ 20-21.

**{20}** Like the plaintiffs in *Houghland* and *Baer*, Vaughan provided sufficient evidence in the record to alert St. Vincent that it was vicariously liable for the actions of Damron as well as any other employees or agents who took part in the mishandling of Vaughan's cancer diagnosis. Vaughan's original complaint, filed in January 2006 within a week after he finally learned of his August 2002 cancer diagnosis, not only named Damron, Voltura, and Wilt, but it indicated St. Vincent's vicarious liability for any other employees or agents involved by alleging that Vaughan's cancer was allowed to grow unchecked "[a]s a consequence of the apparent failure by St. Vincent's Hospital through an administrative inadequacy." Identifying which of St. Vincent's employees or agents negligently failed to communicate Damron's radiology report to Voltura—be it Damron, the transcriber of Damron's report, or some other as-yet-unknown employee or agent of St. Vincent—is immaterial. Because Vaughan's complaint provided St. Vincent with sufficient notice that it was vicariously liable for the actions of its employees and agents, we reverse the district court's grant of summary judgment on this issue.

**B.      Vaughan's Affidavits Raised Genuine Issues of Material Fact Concerning St. Vincent's Negligence**

**{21}** St. Vincent argues that the district court properly granted its motion for summary judgment because Vaughan failed to submit required expert testimony in support of his negligence claim. Vaughan contends that Voltura's sworn statement and the affidavits of Wolfel and Bagwell were more than sufficient to show a genuine dispute of fact worth presenting to a jury. We conclude that summary judgment was inappropriate here because Vaughan's affidavits "set forth specific facts showing that there is a genuine issue for trial," as required by the language of Rule 1-056(E) NMRA.

**{22}** A negligence claim requires that the plaintiff establish four elements: (1) defendant's duty to the plaintiff, (2) breach of that duty, typically based on a reasonable standard of care, (3) injury to the plaintiff, and (4) the breach of duty as cause of the injury. *See Herrera v. Quality Pontiac*, 2003-NMSC-018, ¶ 6, 134 N.M. 43, 73 P.3d 181. If this Court finds "a genuine controversy as to any material fact, summary judgment will be reversed and the disputed facts will be argued at trial." *Rummel v. Lexington Ins. Co.*, 1997-NMSC-041, ¶ 15,

123 N.M. 752, 945 P.2d 970; *see also* Rule 1-056(E) (stating that the party opposing the motion for summary judgment must "show[ by affidavits or . . . otherwise] that there is a genuine issue for trial.").

**{23}** Vaughan filed a response to St. Vincent's motion for summary judgment as well as his own motion for summary judgment, supported by Voltura's statement and the Bagwell affidavit. Voltura's statement indicated she would have done whatever she could to "get ahold of" Vaughan had she known of the possible neoplasm. As Vaughan's treating physician, Voltura's perspective is certainly material to Vaughan's negligence claim. Bagwell's affidavit stated that the delay in Vaughan's diagnosis had a "significant impact" on Vaughan's chances of survival, decreasing the "potential for cure[] by 35%"—facts that support Vaughan's injury and St. Vincent's role in that injury. Like Voltura's statement, there is little doubt that Bagwell's opinion as an oncologist is material here because Bagwell personally treated Vaughan. Wolfel's affidavit stated that how to transmit a cancer diagnosis from a radiologist to the treating physician "is simply a basic communication issue no different than any other communication issue in any other walk of life." In light of his 40 years leading two radiology departments in the state, Wolfel's statement is material to the standard of care in this case. We need not decide whether Vaughan provided expert testimony because this case hinges on an ordinary negligence standard of care which does not require expert testimony. But even if expert testimony were required to establish a medical standard of care in this case, we believe Vaughan provided the requisite expert testimony here, as we explain in Section II.C of this opinion.

**{24}** Affirming the district court's summary judgment ruling, the Court of Appeals concluded that Vaughan "failed to present undisputed detailed facts in regard to any policy, practice, system, or obligation of [St. Vincent], in particular, or for that matter, of any duty, policy, practice, system, or obligation of hospitals generally." *Vaughan*, No. 30,395, mem. op. at 28. Here, the Court appears to have misapplied the summary judgment standard. Defeating summary judgment does not require "undisputed detailed facts" as the Court of Appeals held. To the contrary, summary judgment is inappropriate when there are *disputed* material facts in the record. *See Montgomery*, 2007-NMSC-002, ¶ 16; Rule 1-056(C) ("The judgment sought shall be rendered . . . if . . . there is no genuine issue as to any material fact.").

**{25}** The opinions of Voltura, Bagwell, and Wolfel present issues of material fact as to duty, breach of duty, injury, and causation—the essential elements of Vaughan's negligence claim. While Kozlowski's spare affidavit in support of St. Vincent disputes some of these facts, it negates none of them. Because a reasonable jury could have ruled in favor of Vaughan, we determine that questions of material fact precluded summary judgment on this issue.

**C.      Vaughan's Expert Testimony, While Present, Was Unnecessary to Establish the Standard of Care**

9

**{26}** Because Vaughan presented expert testimony sufficient to establish medical negligence, we do not see a controversy here. We hold nevertheless that the communication of the diagnosis by one doctor to another in this case was subject to review under an ordinary standard of care. This communication was not so far removed from common knowledge that a layperson factfinder could not logically consider whether the failure to communicate was negligent. Reaching a decision in this case does not require the factfinder to decide any medical issues; the communication in this instance is a clerical function.

**{27}** Vaughan alleged that "through an administrative inadequacy [St. Vincent failed] to forward the radiology report on to Dr. Voltura" and that this failure was negligent. Vaughan did not initially distinguish in his complaint whether he was alleging that this was a matter of ordinary negligence or medical negligence. What is required to establish each type of negligence differs significantly:

> Negligence of a doctor in a procedure which is peculiarly within the knowledge of doctors, and in which a layman would be presumed to be uninformed, would demand [expert] medical testimony as to the standard of care. However, if negligence can be determined by resort to common knowledge ordinarily possessed by an average person, expert testimony as to standards of care is not essential.

*Pharmaseal Labs., Inc. v. Goffe*, 1977-NMSC-071, ¶¶ 17, 19-20, 90 N.M. 753, 568 P.2d 589 (holding that summary judgment as to a doctor's negligence was improper in the presence of both expert and lay testimony sufficient to raise genuine issues of fact regarding the alleged negligence). If Vaughan had alleged that this "administrative inadequacy" was an issue of medical negligence he would have been required to bring a medical expert to testify about recognized standards of medical practice in the community and show that a doctor at St. Vincent had neglected to act as required by those standards. Instead, Vaughan's expert, radiologist Wolfel, insisted that the communication was not an issue of medical negligence but was simply about common sense communication, stating in his affidavit,

> 8. It is absolutely the standard of care that a radiologist reading a diagnostic film communicate the results of his diagnostic impression to the physicians known to be managing the care of the patient . . . .

> 9. However there is no medical standard for how this communication is to be accomplished.

**{28}** Because Vaughan's complaint implicated ordinary negligence, he did not need to offer a medical expert to testify about the standard of care; he only needed to establish what a reasonable person would have done under the circumstances. *See Calkins v. Cox Estates*, 1990-NMSC-044, ¶ 11, 110 N.M. 59, 792 P.2d 36 (noting that "New Mexico law recognizes that there exists a duty assigned to all individuals requiring them to act reasonably under the circumstances according to the standard of conduct imposed upon them by the

circumstances").

{29}    Communication between medical personnel is not a matter that requires expert knowledge to understand the standard of care involved. A party may be able to establish that a departure from the standard of ordinary care occurs when a clerical error affects the timeliness or accuracy of a diagnosis. *See* Cecily M. Fuhr, *Cause of Action for Medical Malpractice Based on Misdiagnosis or Failure to Diagnose Cancer*, *in* 45 Causes of Action 2d § 11, 242 (West 2010). Courts in other jurisdictions have reached the same conclusion. In *Jenoff v. Gleason*, 521 A.2d 1323 (N.J. Super. Ct. App. Div. 1987), a radiologist took X-rays of a surgery patient's chest cavity to determine whether the patient was a candidate for anesthesia. *See id.* at 1324-25. The radiologist approved the patient for the anesthesia but while studying the X-ray discovered a potentially cancerous mass in the patient's chest. *See id.* at 1325. The radiologist noted the mass in his report and recommended a follow-up exam, though he did not notify the patient, the surgeon, or the primary care physician. *See id.* It was not until two months after the radiologist took the X-rays that a nurse doing a follow-up check for insurance coverage for the surgery noticed and reported the radiologist's finding concerning the mass in the patient's chest. *See id.* At that time the patient's primary treating physician ordered new X-rays and determined that the mass was indeed cancer. *Id.* The appellate court held that communicating an unusual finding in an X-ray is as important as the finding itself. *See id.* at 1327. The appellate court also held that the circumstances of each case dictate the urgency of the method of communication but that no means of communication between doctors was "so complex and technical that it should escape the comprehension of a lay jury." *Id.* Other jurisdictions or courts have reached similar conclusions regarding negligence arising from failed communications between physicians:

> Stafford v. Neurological Medicine Inc., 811 F.2d 470 (8th Cir. 1987) (applying Missouri law) (plaintiff proved the defendant clinic was negligent in placing an incorrect brain tumor diagnosis on a Medicare claim form to induce prompt payment for a CT scan undertaken to rule out a brain tumor, causing patient to commit suicide); James v. U.S., 483 F. Supp. 581 (N.D. Cal. 1980) (applying California law) (misfiling of X-rays and radiologist's report showing lung abnormality); Yaniv v. Taub, 256 A.D.2d 273, 683 N.Y.S.2d 35 (1st Dep't 1998) (single-physician clinic liable for failure to transmit radiologist's report on chest X-ray to treating physician); Alessio v. Crook, 633 S.W.2d 770 (Tenn. Ct. App. 1982) (defendant admitted negligence for failure to check for X-ray report showing abnormality in lung before releasing patient from hospital).

Fuhr, *supra*, at 242; *see also Variety Children's Hosp. v. Osle*, 292 So. 2d 382, 384 (Fla. Dist. Ct. App. 1974) (holding that evidence of an error in failing to distinguish the anatomical origins of two tissue samples established negligence).

{30}    We reach the same conclusion. A professional setting such as a hospital might tailor

11

communications to fit specific needs, but the fact that communication must occur is within the realm of common knowledge. A reasonable patient understands that the radiologist who processes X-rays needs to communicate the results to the treating physician. Basic human communication, even between doctors, is not so far from common knowledge that it requires an expert's testimony.

**{31}** The conclusion this Court reached in *Toppino v. Herhahn*, 1983-NMSC-079, 100 N.M. 564, 673 P.2d 1297, illustrates the same principle. The plaintiff in that case sought reconstructive surgery for her right breast, which had been surgically removed by a doctor treating a cancer. *See id.* ¶ 2. The first surgeon recommended that the defendant perform the reconstructive surgery. *Id.* Over the course of five procedures the defendant placed implants that respectively were too high and too small, were compressed and flat, caused scarring, ruptured, drifted, and were unnaturally low to the point where the plaintiff could not wear a regular bra. *See id.* ¶¶ 3-8. At the close of the plaintiff's case the trial court granted the defendant's motion for a directed verdict on the issue of negligence because the plaintiff had failed to produce expert testimony that the defendant had deviated from acceptable standards of medical practice. *See id.* ¶ 12. An expert who testified at the trial stated that "[w]hat [the defendant] did certainly was within the realm of what we do in our field and in an attempt to correct the problem that's occurred." *Id.* ¶ 11. The Court of Appeals upheld the directed verdict in favor of the defendant. *See id.* ¶ 1. This Court reversed, holding that because the jury did not need to make a medical determination regarding the defendant's surgery procedures, the plaintiff did not have to present expert testimony to prove negligence. *See id.* ¶ 15. We stated that "it is within the realm of the common knowledge of the average person that a breast implant should balance its healthy counterpart in size and location." *Id.*

**{32}** The jury in *Toppino* did not have to decide whether the defendant's surgical procedures deviated from an acceptable standard of medical care; the results were so far from reasonable that a lay person could logically understand that the doctor was negligent. Vaughan presents the factfinder with a similar question. Here, the factfinder would simply decide whether hospital communication failure violated a reasonable standard of care under the circumstances.

**{33}** Vaughan was correct in asserting that his claim for "administrative inadequacy" was a claim for ordinary negligence that required no expert testimony. Had expert testimony been required, Vaughan also presented expert testimony sufficient to establish medical negligence.

## III.    CONCLUSION

**{34}** Vaughan's complaint adequately notified St. Vincent that it was liable for the negligence of one or more of its agents. Vaughan's expert affidavits established disputed issues of fact concerning the negligence of St. Vincent's agents in failing to communicate Vaughan's cancer diagnosis to Vaughan or his treating doctor. We reverse the Court of Appeals and the district court and remand for a trial on the merits.

**{35}  IT IS SO ORDERED.**

_____
**CHARLES W. DANIELS, Justice**

**WE CONCUR:**

_____
**PETRA JIMENEZ MAES, Justice**

_____
**RICHARD C. BOSSON, Justice**

_____
**EDWARD L. CHÁVEZ, Justice**

_____
**LINDA M. VANZI, Judge**