**IN THE SUPREME COURT OF THE STATE OF NEW MEXICO**

Opinion Number: 2020-NMSC-001

Filing Date: December 5, 2019

No. S-1-SC-36764

**MARLINA ROMERO,**

Plaintiff-Petitioner,

v.

**LOVELACE HEALTH SYSTEM, INC.,**
**A New Mexico Corporation,**

Defendant-Respondent,

and

**WOMEN'S SPECIALISTS OF NEW MEXICO, LTD.,**
**a New Mexico Corporation, and**
**KRISTINA CHONGSIRIWATANA, M.D.,**

Defendants.

**ORIGINAL PROCEEDING ON CERTIORARI**
**Nan G. Nash, District Judge**

Released for Publication January 21, 2020.

Kennedy, Hernandez & Associates, P.C.
Paul John Kennedy
Arne Robert Leonard
Jessica Hernandez
Albuquerque, NM

for Petitioner

Rodey, Dickason, Sloan, Akin & Robb, P.A.
Edward R. Ricco
Paul R. Koller
Albuquerque, NM

for Respondent

## OPINION

**VIGIL, Justice.**

**{1}**     Plaintiff filed an application to the New Mexico Medical Review Commission (MRC) alleging that as a result of medical negligence Plaintiff's pregnancy was aborted. The alleged negligence concerns Lovelace Health System, Inc. (Lovelace) in part. Lovelace is not a qualified provider under the Medical Malpractice Act (MMA), NMSA 1978, §§ 41-5-1 to -29 (1976, as amended through 2015). The narrow issue in this case is whether Plaintiff's application to the MRC tolled the running of the three-year limitations period for filing medical malpractice claims against Lovelace. In an unpublished opinion, our Court of Appeals affirmed the order of the district court which dismissed the complaint against Lovelace on the basis that Plaintiff's application to the MRC was not specific enough in making allegations against Lovelace to trigger the MMA's tolling provision on Plaintiff's claims against Lovelace. *Romero v. Lovelace Health Sys., Inc.*, A-1-CA-35177, mem. op. ¶¶ 25, 27, 31 (N.M. Ct. App. Oct. 26, 2017) (nonprecedential). We reverse.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

**{2}**     Plaintiff filed a complaint for medical negligence, respondeat superior, and damages, naming Lovelace, Women's Specialists of New Mexico, Ltd. (Women's Specialists), and Kristina Chongsiriwatana, M.D., as defendants. Lovelace filed a motion to dismiss, arguing that Plaintiff's claims against Lovelace were barred by the statute of limitations. Plaintiff responded that her complaint against Lovelace was not barred because prior to filing the complaint she filed an application to the MRC pursuant to the MMA, thereby tolling the statute of limitations. *See* § 41-5-22 (providing that upon submission of an application to the MRC, "[t]he running of the applicable limitation period in a malpractice claim shall be tolled"). The parties agreed that although Lovelace is not a qualified provider under the MMA, if Lovelace was named in the MRC application, the running of the limitations period was effectively tolled. *See Grantland v. Lea Regional Hosp.*, 1990-NMSC-076, ¶¶ 4, 9, 110 N.M. 378, 796 P.2d 599 (holding that filing a medical malpractice application to the MRC "tolls the statute of limitations period" as to nonqualified health care providers). However, the parties disagreed on whether Lovelace was actually named in the MRC application, Plaintiff contending that it was and Lovelace contending that it was not.

**{3}**     The MRC application was presented to the district court to resolve the dispute. The MRC application is in the form of a letter from Plaintiff's attorneys that is addressed to the MRC. Beneath the caption, "A. Statement of Facts, Including Dates and Circumstances," the MRC application recites that in the fall of 2010 Plaintiff wanted to become pregnant. In June 2011 Plaintiff tested positive for pregnancy on a home pregnancy test that was confirmed in a June 14, 2011, visit to Women's Specialists. During this visit, Plaintiff reported that she was experiencing abdominal and pelvic pain that started around February 27, 2011. As a result, Plaintiff had an ultrasound, which the radiologist reported "showed no evidence of an ectopic or intrauterine pregnancy."

**{4}**     The MRC application adds that on June 17, 2011, Plaintiff arrived at Lovelace Medical Center complaining of a sharp pain in her lower abdomen and left side pelvic region, together with some vaginal spotting. Doctors at Lovelace Medical Center, which Lovelace operates, examined Plaintiff and ordered hormone studies and ultrasounds. The hormone studies were deemed consistent with being three to four weeks pregnant, and the radiology technician told Plaintiff there were signs of pregnancy. However, the Lovelace Medical Center doctor who signed the ultrasound reports said "endovaginal scans demonstrate a small intrauterine fluid filled structure" which was "probably a pseudogestational sac," and he also noted "a cystic structure within the right ovary with a 'ring of fire.'" After discussing these findings, the Lovelace doctors transferred Plaintiff to Lovelace Women's Hospital in an ambulance. Lovelace also operates Lovelace Women's Hospital.

**{5}**     The MRC application continues that at Lovelace Women's Hospital Dr. Chongsiriwatana performed a diagnostic laparoscopy for a presumed ectopic pregnancy and, finding no sign of an ectopic pregnancy, made the postoperative diagnosis of a right ovarian cyst. After the laparoscopy and draining of the cyst, and despite having discovered no visible evidence of an ectopic pregnancy, Dr. Chongsiriwatana treated Plaintiff with methotrexate, which carries a high risk of birth defects. Dr. Chongsiriwatana did not obtain Plaintiff's informed consent before administering methotrexate because Plaintiff was heavily medicated.

**{6}**     The MRC application concludes by stating that six days later, on June 23, 2011, when Plaintiff returned to Lovelace Women's Hospital to see Dr. Chongsiriwatana because she was still experiencing pain, Dr. Chongsiriwatana ordered hormone tests and an ultrasound. The ultrasound showed "a saclike structure in the uterus and normal ovaries." Upon receiving the ultrasound results, Dr. Chongsiriwatana told Plaintiff, "I'm sorry. We messed up. You have a normal pregnancy, and because we gave you methotrexate, you must abort it due to possible birth defects." Consequentially, Plaintiff's planned pregnancy was aborted. Subsequently Plaintiff suffered severe depression with added adverse effects on her relationships and employment. "[Plaintiff] and her boyfriend broke up, and [Plaintiff] saw a mental health counselor for several months."

**{7}**     Following the foregoing statement of facts in Plaintiff's application to the MRC is the caption, "B. Individuals Involved," and a subheading stating "The names, addresses, and phone numbers of all providers whose care may be germane to the issues are as follows[.]" However, the listing provided does not include Lovelace and Women's Specialists. Instead, the MRC application lists the actual doctors and other persons who treated Plaintiff, by name, address, and phone number. Finally, the MRC application has a third caption, "C. Medical Releases," with Plaintiff's medical releases attached. One of the medical releases is a Lovelace Health System medical release. This single document authorizes the release of Plaintiff's health information——from Lovelace Medical Center (Gibson), Lovelace Westside Hospital, Lovelace Medical Center (Downtown), and Lovelace Women's Hospital——to the MRC.

**{8}** In ruling on Lovelace's motion to dismiss, the district court considered Plaintiff's application to the MRC as well as letters from the MRC requesting medical records from Plaintiff's providers, which the parties attached to their briefs. The district court converted the motion to dismiss into a motion for summary judgment under Rule 1-012(C) NMRA (stating that "if . . . matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 1-056 NMRA"). The district court ruled that "Lovelace was not named in the [MRC] application" as required by Section 41-5-15(B)(1), stating that "there are no dates and circumstances suggesting malpractice, negligence, alleged acts or respondeat superior on behalf of Lovelace." The district court therefore concluded that "the statute of limitations was not tolled as to Lovelace" and dismissed Plaintiff's claims against Lovelace.

**{9}** The Court of Appeals memorandum opinion affirmed the district court. *Romero*, A-1-CA-35177, mem. op. ¶¶ 27, 30-31. The Court of Appeals held that "if a plaintiff wishes to utilize the tolling provision in Section 41-5-22 against particular providers, then he or she must identify the alleged act or acts of malpractice against those particular providers." *Id.* ¶ 25. Concluding that Plaintiff's MRC application failed to meet this standard of pleading, the Court of Appeals agreed with the district court that the tolling provision did not apply and affirmed dismissal of Plaintiff's claims against Lovelace. *Id.* ¶¶ 25, 30-31. We granted Plaintiff's petition for a writ of certiorari, and we now reverse.

## II.    DISCUSSION

**{10}** Plaintiff argues that the manner in which its MRC application named Lovelace satisfies the text, structure, and purpose of the MMA and achieves the purpose of tolling the applicable limitations period. Plaintiff also asserts that the MMA does not impose a heightened standard of pleading for naming providers in an MRC application, especially in this case, because the Legislature did not intend for the MMA to protect health care providers such as Lovelace who choose to opt out of the screening requirements of the MMA. Lovelace responds that Plaintiff's MRC application only lists one or another Lovelace facility where Plaintiff received medical care. Lovelace asserts that an MRC application serves the same function that a complaint ordinarily serves to satisfy the statute of limitations. Lovelace argues that to rely on tolling with respect to any provider, an MRC application must give notice to a provider that a medical malpractice claim is being asserted against it. Lovelace further contends that because Plaintiff's application does not articulate what Lovelace did, either directly or indirectly or through an employee or agent, to give Lovelace notice of Plaintiff's claims against it, "the application did not toll the limitation period against Lovelace." For the reasons that follow, we conclude that Plaintiff's arguments prevail.

### A.    Standard of Review

**{11}** New Mexico courts disfavor summary judgment, as it is a drastic remedy to be used with great caution. *Romero v. Philip Morris, Inc.*, 2010-NMSC-035, ¶ 8, 148 N.M.

713, 242 P.3d 280 (citing *Pharmaseal Labs., Inc. v. Goffe*, 1977-NMSC-071, ¶ 9, 90 N.M. 753, 568 P.2d 589). "This Court's review of orders granting or denying summary judgment is de novo. Summary judgment is appropriate in the absence of any genuine issues of material fact and where the movant is entitled to judgment as a matter of law." *Cahn v. Berryman*, 2018-NMSC-002, ¶ 12, 408 P.3d 1012 (internal quotation marks and citation omitted). "In reviewing an order on summary judgment, we examine the whole record on review, considering the facts in a light most favorable to the nonmoving party and drawing all reasonable inferences in support of a trial on the merits." *Id.* (internal quotation marks and citation omitted). To the extent we must construe the applicable statutes, our review is de novo. *Hovet v. Allstate Ins. Co.*, 2004-NMSC-010, ¶ 10, 135 N.M. 397, 89 P.3d 69 ("Statutory interpretation is a question of law, which we review de novo.").

**B.      Operation of the MMA**

**{12}**    New Mexico reformed its medical malpractice laws in 1976 in response to a perceived crisis of increasingly unavailable medical malpractice insurance. *See Cahn*, 2018-NMSC-002, ¶ 13. To achieve its goal of making professional liability insurance available for health care providers in New Mexico, the Legislature adopted the MMA, offering certain "benefits." *Roberts v. Sw. Cmty. Health Servs.*, 1992-NMSC-042, ¶ 13, 114 N.M. 248, 837 P.2d 442. Included in these "benefits" are medical malpractice coverage, *see* § 41-5-25, limitations on malpractice awards, *see* § 41-5-6, limitations on personal liability for future medical expenses, *see* § 41-5-7, and mandatory screening of medical malpractice claims before they can be filed in court, *see* §§ 41-5-14 to -21. *Id.* However, the Legislature conditioned a health care provider's entitlement to these "benefits" on "qualifying" for the MMA. Section 41-5-5(C). "[Q]ualified" health care providers are those who meet certain financial requirements set forth in Section 41-5-5 and are therefore entitled to all the benefits of the MMA. A health care provider who chooses not to participate is a "non-qualified" health care provider who "shall not have the benefit of any of the provisions of the [MMA] in the event of a malpractice claim against it." Section 41-5-5(C). "Thus, the legislature encouraged health care providers to become qualified by accepting the burdens of qualification, and offered certain benefits in return." *Roberts*, 1992-NMSC-042, ¶ 13.

**{13}**    The "benefit" we consider in this case is the mandatory procedure for reviewing medical malpractice claims. The function of the MRC, created by the MMA, "is to provide panels to review all malpractice claims against health care providers covered by the [MMA]." Section 41-5-14(A). All medical malpractice claims against qualified health care providers must first be screened by a panel of the MRC: "No malpractice action may be filed in any court against a qualifying health care provider before application is made to the [MRC] and its decision is rendered." Section 41-5-15(A). Pertinent to the case before us here, the application must include "a brief statement of the facts of the case, naming the persons involved, the dates and the circumstances, so far as they are known, of the alleged . . . malpractice[.]" Section 41-5-15(B)(1). Upon receipt of the application, the MRC is required to serve a copy of the application on the health care providers involved, who are then required to answer the application for review. Section

41-5-16(A), (B). A panel, consisting of members of the state professional society or association of health care providers and members of the state bar association, is then appointed to review the case. Section 41-5-17(A)-(D). Following a hearing, the panel deliberates and decides two questions: "(1) whether there is substantial evidence that the acts complained of occurred and that they constitute malpractice; and (2) whether there is a reasonable medical probability that the patient was injured thereby." Section 41-5-20(A). Whatever it decides, "[t]he panel's decisions shall be without administrative or judicial authority and shall not be binding on any party." Section 41-5-20(F).

{14}   One of the additional solutions to the problem of "insurance carriers . . . withdrawing from medical malpractice liability coverage" in New Mexico was to preclude malpractice claims brought more than three years after the act of malpractice. *Cummings v. X-Ray Assocs. of N.M., P.C.*, 1996-NMSC-035, ¶ 40, 121 N.M. 821, 918 P.2d 1321. The statute of limitations for claims against a qualified health care provider is governed by Section 41-5-13 (stating that the claim must be filed "within three years after the date that the act of malpractice occurred" with an exception for claims of minors under the full age of six). This occurrence-based statute of repose triggers the start of the time period for a patient's right to action when the malpractice occurs and terminates the period three years later, regardless of whether the injury has manifested itself. *Cummings*, 1996-NMSC-035, ¶¶ 50-51; *see also Cahn*, 2018-NMSC-002, ¶¶ 14-15. The statute of limitations for claims against a nonqualified health care provider, on the other hand, is governed by NMSA 1978, Section 37-1-8 (1976) (providing that actions must be brought "for an injury to the person or reputation of any person, within three years"). This is discovery-based accrual under which the limitations period "does not begin to run until the patient discovers, or reasonably should discover, the essential facts" of the medical malpractice claim. *Cummings*, 1996-NMSC-035, ¶ 47.

{15}   Upon a plaintiff's submission of an application to the MRC, "the running of the [three-year] limitation period . . . shall be tolled and shall not commence to run again until thirty days after the panel's final decision is entered in the permanent files of the [MRC] and a copy is served upon the claimant and his attorney by certified mail." Section 41-5-22. The MRC is required to review medical malpractice claims against qualified providers, but there is no requirement that the MRC review claims against nonqualified providers. *See* § 41-5-14(A), (C). Nevertheless, we have held that submission of an application to the MRC pursuant to Section 41-5-15(B) tolls the running of the applicable limitations period with respect to both qualified and nonqualified providers. *Grantland*, 1990-NMSC-076, ¶¶ 4, 9; *see Roberts*, 1992-NMSC-042, ¶¶ 1, 14, 16, 19 (concluding that the MMA is consistent with the discovery rule and with Section 37-1-8 governing commencement of the limitations period for nonqualified providers). We must therefore determine whether Plaintiff's application to the MRC satisfied the requirements of Section 41-5-15(B)(1) concerning Lovelace.

**C.   Whether Plaintiff's MRC Application Tolled the Running of the Limitations Period with Respect to Plaintiff's Claims against Lovelace**

**{16}** Lovelace and its doctors are certainly familiar with the technical medical language in Plaintiff's MRC application. Herein, we describe what some of the medical terms commonly mean to doctors in this field. A "gestational sac" is a "sac comprising the extraembryonic membranes that envelop the embryo or fetus," and "pseudogestation" is defined as "false pregnancy." *Dorland's Illustrated Medical Dictionary* 1660, 1542 (32nd ed. 2012). Additionally, a "ring of fire" is indicative of an ectopic pregnancy. *See* Edward P. Lin, M.D., et. al., *Diagnostic Clues to Ectopic Pregnancy*, 28 Radiographics 1661, 1665, 1669 (2008).

**{17}** Stripped of technical medical language, Plaintiff's MRC application is very detailed and specific in describing what happened. On June 17, 2011, Plaintiff, who was pregnant, went to Lovelace Medical Center with sharp pain in her lower abdomen and left pelvic area, together with vaginal spotting. Hormone studies confirmed Plaintiff's pregnancy, but after reading an ultrasound, the Lovelace doctors erroneously concluded that the sac seen in Plaintiff's uterine cavity was a "false pregnancy" and that Plaintiff had an ectopic pregnancy on the right ovary. Based on these erroneous findings, the doctors sent the Plaintiff to Lovelace Women's Hospital in an ambulance for treatment. At Lovelace Women's Hospital, Dr. Chongsiriwatana performed a diagnostic laparoscopy for the presumed ectopic pregnancy on the right ovary. Finding no ectopic pregnancy on the right ovary, Dr. Chongsiriwatana diagnosed the presence of a right ovarian cyst and treated Plaintiff with methotrexate without obtaining Plaintiff's informed consent. The methotrexate was administered notwithstanding its association with a high risk of birth defects, without first obtaining ultrasounds or other tests to determine whether Plaintiff was in fact pregnant. Plaintiff returned to Lovelace Women's Hospital six days later because she was still experiencing pain. Belatedly, Dr. Chongsiriwatana ordered hormone tests and an ultrasound, and the ultrasound showed that Plaintiff had a normal pregnancy. Because Plaintiff was treated with methotrexate, Plaintiff's pregnancy was aborted.

**{18}** The scenario clearly described in Plaintiff's MRC application represents what Plaintiff contends is medical malpractice on the part of Lovelace and its doctors. "'Pseudogestational sac' refers to fluid (blood or secretions) in the uterine cavity that is occasionally seen in a woman with ectopic pregnancy." Peter M. Doubilet & Carol B. Benson, *First, Do No Harm . . . to Early Pregnancies*, 29 J. Ultrasound Med. 685, 687 (2010). "Administering an embryotoxic agent to, or evacuating the uterus of, a woman with an IUP [a normal intrauterine pregnancy]——which could occur if a gestational sac is *erroneously called a pseudogestational sac*——is a serious error, whereas delaying treatment in a woman with ectopic pregnancy——which could occur if a pseudogestational sac is erroneously called a gestational sac——will often have little effect on outcome if the patient is medically stable." *Id.* at 685, 688 (emphasis added).

**{19}** Consistent with Section 41-5-15(B)(1), Plaintiff's application to the MRC clearly "nam[es]" Lovelace, and the application recites "a brief statement of the facts" describing "the dates and the circumstances, so far as they are known, of the alleged act or acts of malpractice[.]" While the MRC application does not describe specific acts of malpractice directly committed by Lovelace, the application does describe clearly and

specifically the acts and omissions of named employees and physicians working in Lovelace hospitals. This is sufficient as a matter of law.

**{20}** In *Zamora v. St. Vincent Hospital*, 2014-NMSC-035, ¶ 1, 335 P.3d 1243, a medical negligence case, the plaintiff alleged that as a result of a communication failure between a surgeon and a contract radiologist, St. Vincent Hospital failed to tell the plaintiff about his cancer diagnosis. The contract radiologist was not named as a defendant, and the plaintiff did not specifically plead vicarious liability. *Id.* ¶¶ 1, 4. The district court granted St. Vincent summary judgment on the basis that the complaint did not provide notice that the contract radiologist was negligent and that St. Vincent was vicariously liable for his negligence. *Id.* ¶ 6. Although we agreed that the complaint was "rudimentary," we reversed because the complaint highlighted the relevant key facts and actors, emphasizing the negligent breakdown in communication for which St. Vincent was ultimately responsible. *Id.* ¶ 14. "Because St. Vincent was adequately apprised of the nature of [the plaintiff's] claim against it that someone in St. Vincent's sphere of responsibility failed to communicate vital medical information from a radiology report, it was immaterial that the complaint failed to specify which particular agents were negligent or which theory of agency resulted in liability on the part of St. Vincent." *Id.* ¶ 15. While the complaint failed to name a theory of vicarious liability, "the reality is that New Mexico's pleading standards require no more detail than [the plaintiff] provided." *Id.* ¶ 14.

**{21}** Similar circumstances arose in *Baer v. Regents of Univ. of Cal.*, 1994-NMCA-124, ¶¶ 1, 2, 118 N.M. 685, 884 P.2d 841, where the plaintiff's employer, the operator of Los Alamos National Laboratory (LANL), required its employees to undergo physical examinations in order to remain employed. Plaintiff's estate brought a medical malpractice action against LANL, the physician employed by LANL, "'and other medical personnel at LANL'" alleging negligence "in failing to diagnose a nodule in the lungs of [the plaintiff] as being cancerous." *Id.* ¶ 5. Of the LANL medical personnel who examined the plaintiff, the last to do so was the physician's assistant. *Id.* ¶¶ 1, 4. The physician's assistant did not take x-rays, notwithstanding that prior x-rays showed lesion in the plaintiff's right lung. *Id.* ¶¶ 3, 5. After the claim against the LANL physician was dismissed because the limitations period had expired, the only claim that remained was against the physician's assistant as an employee of LANL. *Id.* ¶¶ 9, 10. Ultimately, the question was whether LANL could be held liable under the doctrine of respondeat superior when the complaint did not name the physician's assistant as a defendant. *Id.* ¶ 18. Our Court of Appeals concluded that LANL could be held liable because the complaint clearly stated that "'medical personnel at LANL'" committed the alleged negligence. This was sufficient, the Court concluded, because it gave adequate notice that one of the plaintiff's theories of the case against LANL was vicarious liability, "and we know of no authority for the proposition that, in order to prove agency, the agent must be joined as a party to the action." *Id.* ¶ 20.

**{22}** Lovelace contends that an MRC application "serves the function a complaint ordinarily would serve with respect to satisfying the statute of limitations." In this regard, Lovelace continues, "an application to the MRC must do what a complaint ordinarily

would do: provide the defendant with timely notice of a claim within the limitations period, so that the defendant is not unfairly prejudiced by the passage of time in mounting its defense." Assuming without deciding that a nonqualified provider is entitled to such notice in an MRC application, we hold that the application submitted by Plaintiff in this case provided that notice in accordance with *Zamora* and *Baer*. The MRC application is detailed and specific in describing what doctors and employees did and did not do in treating Plaintiff at the identified Lovelace hospitals. These facts alone raise the issue of the vicarious liability of Lovelace. *See* UJI 13-1120A NMRA (setting forth the elements of vicarious liability of a hospital for the negligence of hospital employees); UJI 13-1120B NMRA (setting forth the elements of vicarious liability of a hospital for the negligence of health care providers who, while not hospital employees, are the hospital's apparent or ostensible agents). Because a corporation such as Lovelace acts through its officers, agents, and employees, we disagree with the Court of Appeals that Plaintiff's MRC application fails to provide sufficient notice of her claims against Lovelace. In addition, the facts may support claims of negligence against Lovelace for its own conduct. *See Trujillo v. Puro*, 1984-NMCA-050, ¶ 8, 101 N.M. 408, 683 P.2d 963 (holding that it is "not necessary that each of plaintiff's counts, nor each of his allegations, be presented to the [MRC]"); *see also* UJI 13-1119A NMRA (setting forth the duty of a hospital in providing patient care).

## III.    CONCLUSION

**{23}**    We reverse the Court of Appeals, and we remand the case to the district court for further proceedings consistent with this opinion.

**{24}    IT IS SO ORDERED.**

**MICHAEL E. VIGIL, Justice**

**WE CONCUR:**

**BARBARA J. VIGIL, Justice**

**C. SHANNON BACON, Justice**

**DAVID K. THOMSON, Justice**

**NAKAMURA, Chief Justice (dissenting)**

**{25}**    To benefit from the tolling provisions of the MMA one must comply with the legislature's unambiguous requirement that an application be filed "naming" those involved in the alleged malpractice. Section 41-5-15(B)(1).  In recognition of this requirement, Romero submitted an application with the heading "individuals involved" followed by a subheading  "names . . . of all providers whose care may be germane to the issues."  Lovelace is not identified, compelling the district court and a unanimous Court of Appeals' panel to correctly conclude that Lovelace was not named.  Because

the district court's decision to dismiss Lovelace should be affirmed, I respectfully dissent.

**{26}**     The Majority contends that there is a way to read Romero's application as "naming" Lovelace.  Our Legislature could not have intended the MRC or this Court to have to engage in creative reading exercises to identify who, precisely, victims of malpractice intend to sue when they submit applications to the MRC.

**{27}**      "When facts relevant to a statute of limitations issue are not in dispute, the standard of review is whether the district court correctly applied the law to the undisputed facts."  *Haas Enters., Inc. v. Davis*, 2003-NMCA-143, ¶ 9, 134 N.M. 675, 82 P.3d 42 (citing *Inv. Co. of the Sw. v. Reese*, 1994-NMSC-051, ¶ 11, 117 N.M. 655 875 P.2d 1086).  The facts here, as noted above, are not disputed:  Romero failed to name Lovelace in her application as required by Section 41-5-15(B)(1).[1]  Having failed to do so, Romero cannot avail herself of the tolling provision in Section 41-5-22 with respect to Lovelace.

**{28}**     There can be no doubt that the Legislature imposed the naming requirement in part to ensure that defendants have notice claimants intend to pursue malpractice actions against them.  But other provisions in the MMA make clear that the naming provision has added significance when a claimant intends to pursue vicarious liability claims.

**{29}**     Where the MRC receives an application asserting vicarious liability, it is required to notify certain, specific entities of the existence of the claim.  Section 41-5-16(C).  The full text of this provision reads as follows:

> In instances where applications are received employing the theory of respondeat superior or some other derivative theory of recovery, the director shall forward such applications to the state professional societies, associations or licensing boards of both the individual health care provider whose alleged malpractice caused the application to be filed, and the health care provider named a respondent as employer, master or principal.

*Id.*  The MRC is also required to modify the complexion of the review panel when an application includes vicarious liability claims.  Section 41-5-17(E).  The full text of this requirement is as follows:

> In those cases where the theory of respondeat superior or some other derivative theory of recovery is employed, two of the panel members shall be chosen from the individual health care provider's profession and one panel member shall be chosen from the profession of the health care provider named a respondent employer, master or principal.

---

[1]Neither this requirement, nor why the benefits of the MMA extend to Defendant's suing nonqualified providers, is challenged by the parties.

*Id.*

**{30}** Statutes must be construed "so that no word and no part thereof is rendered surplusage or superfluous." *Stang v. Hertz Corp.*, 1970-NMSC-048, ¶ 13, 81 N.M. 348, 467 P.2d 14. The provisions above must inform this Court's understanding of what it means to "name" the source of an act of alleged malpractice.

**{31}** The reading of the naming provision that most sensibly accounts for the above provisions is the plain-meaning one: when a plaintiff intends to assert a claim of vicarious liability, he or she must alert the MRC to this fact in clear and express terms. The Court of Appeals' interpretation of Section 41-5-15(B)(1) comports with this plain-meaning construction.

**{32}** Romero's repeated insistence that requiring her to do what the plain meaning of Section 41-5-15(B)(1) requires imposes upon her "a heightened application standard" is not to be given any credit. Requiring a plaintiff to state in an application to the MRC that they intend to sue a particular health care provider on vicarious liability grounds imposes no "heightened" burden of any kind. She demonstrated quite ably her ability to assert a vicarious liability claim against Lovelace when, only five months after she submitted her application to the MRC, she filed her complaint doing so. The words "respondeat superior" appears in the title of her complaint. Lovelace is a named party. Count III is identified as a "Respondeat Superior" claim against Lovelace.

**{33}** No equivalently clear statement appears in Romero's application to the MRC. Why this is we do not know. We do know, however, that the MRC itself did not understand that Romero meant to name Lovelace and assert vicarious liability claims against it. This is evident given that the MRC's letter to Lovelace indicated that Romero's claims "do[] not involve you[.]"

**{34}** Likewise, the district court and all three Court of Appeals judges involved in the opinion below did not think Romero's application named Lovelace or made clear her intentions to assert a vicarious liability claim against Lovelace. In fact, the Court of Appeals unanimously concluded that "there is nothing that clearly states [Romero] believed Lovelace was negligent or that Dr. Chongsiriwatana was an employee or agent of Lovelace." *Romero*, A-1-CA-35177, mem. op. ¶ 23. And even the Majority opinion acknowledges that Romero's "MRC application does not describe specific acts of malpractice directly committed by Lovelace[.]" *Maj. Op.* ¶ 19.

**{35}** The Majority's answer to the fact that Romero's complaint does not expressly name Lovelace or assert a vicarious liability claim against it is that our rules of civil procedure and notice-pleading standards did not require Romero to do this. They reason that Romero's general averments about Lovelace's involvement in her care were sufficient to satisfy the naming provision and alert both the MRC and Lovelace to the vicarious liability claims she intended to pursue. I cannot agree. The principles upon which this conclusion rests are inapplicable.

**{36}** This Court is constitutionally empowered to promulgate rules of practice and procedure. *Ammerman v. Hubbard Broad., Inc.*, 1976-NMSC-031, ¶ 10, 89 N.M. 307, 551 P.2d 1354; *State ex rel. Anaya v. McBride*, 1975-NMSC-032, ¶ 10, 88 N.M. 244, 539 P.2d 1006. Yet, when the Legislature confers a benefit upon litigants, it can specify the circumstances that must be met to invoke that benefit. *See AFSCME v. Bd. of Cty. Comm'rs of Bernalillo Cty.*, 2016-NMSC-017, ¶ 14, 373 P.3d 989. Statutes of limitations are creatures of legislative making and a permissible and constitutional exercise of legislative power. *See Cummings*, 1996-NMSC-035, ¶ 37. Accordingly, the Legislature's prerogatives—to the extent we can discern them—must factor into how we are to think about what constitutes compliance with Section 41-5-15(B)(1), not the principles and policies underlying notice pleading.

**{37}** Rule 1-008 NMRA and Section 41-5-15(B)(1) have little in common. Rule 1-008 includes no special procedures that must be followed when a claimant asserts vicarious liability. As already noted, unless the plaintiff names the parties he or she intends to assert vicarious liability claims against in the application to the MRC, the MRC will have no reason to do what the Legislature expected of them. The two provisions are self-evidently different and those differences must be regarded and given meaning. These thoughts make obvious why *Zamora* and *Baer* are not dispositive here.

**{38}** *Zamora* focused on Rule 1-008, the policy concerns and principles underlying notice pleading, and the inferences that can be permissibly drawn about pleading and practice in New Mexico given our early adoption of the "simplified notice pleading standard." *Zamora*, 2014-NMSC-035, ¶¶ 10-20. The statement in *Zamora* that civil complaints need not "recite reliance on theories of vicarious liability" does not resolve the issue here. *Id.* ¶ 14.

**{39}** *Baer* offered generalized pronouncements about pleading standards and vicarious liability claims, pronouncements quite similar to those found in *Zamora*. *Baer*, 1994-NMCA-124, ¶ 20. Like *Zamora*, *Baer* does nothing to illuminate what our Legislature's intentions were when it enacted Section 41-5-15(B)(1).

**{40}** Expecting Romero to comply with the plain language of Section 41-5-15(B)(1) in no way ensnares her in some procedural "booby trap." Nor is it permissible to describe the expectation that she comply with the plain language of the provision as holding her to some unfair "technicality" or "putting form over substance." The Legislature decided that to receive the tolling provided by Section 41-5-22, Romero had to comply with Section 41-5-15(B)(1). To comply with Section 41-5-15(B)(1), Romero had to "name" Lovelace as having committed an act of malpractice. She did not. To the extent this error foreclosed an avenue of relief or a remedy, Romero has other remedies to right that wrong. She has no remedy in words she did not follow.

**{41}** For these reasons, I respectfully dissent.

**JUDITH K. NAKAMURA, Chief Justice**